UNITED STATES of America, Plaintiff,

Sidney Williams, et al., Plaintiff–Intervenors,

v.

The CITY OF MONTGOMERY, ALABAMA, et al., Defendants,

Gordon M. Ledbetter and John D. Shumway, Defendant–Intervenors.

Civil Action No. 3739-N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 18, 1996.

70. Flood aff., ex. 37 to brief in support of plaintiff's motion to reconsider, filed July 19, 1996.

71. *Id.* at 2.

Kenneth E. Vines, Assistant United States Attorney, Montgomery, AL, Marybeth Martin, Philip Eure, Employment Litigation Section, Civil Rights Division, Department of Justice, Washington, DC, for plaintiff.

Randall C. Morgan, Montgomery, AL, for defendant City of Montgomery.

Robert D. Segall, Montgomery, AL, for defendant Montgomery City–County Pers. Bd.

Thomas M. Goggans, Montgomery, AL, for defendant-intervenors white male police officers of the City of Montgomery.

Donald Watkins, and Mark Englehart, Kenneth L. Thomas, Massey, Means & Thomas, Montgomery, AL, co-counsel for plaintiff-intervenors Williams, et al.

Thomas C. Tankersley, Legal Department, City of Montgomery, Montgomery, AL, for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In response to a request made by the court on May 21, 1996, the parties have submitted a proposal for the termination of this 24–year–old lawsuit, in which the United States of America and a class of African–American police officers charged the City of Montgomery with race discrimination. Based on the evidence presented, the court concludes that the proposal should be approved.

## I. BACKGROUND

This lawsuit has a long and complex history. Nevertheless, a general overview is necessary for proper consideration of the pending proposal for termination.

### A. The October 1972 Plan

In August 1972, the United States filed this lawsuit, charging the City of Montgomery with race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17; the fourteenth amendment to the Constitution of the United States, as enforced by 42 U.S.C.A. § 1983; and 42 U.S.C.A. §§ 1981, 1985(3). Those named as defendants were the City of Montgomery, Alabama, the Montgomery City–County Personnel Board, and the City of Montgomery Water Works and Sanitary Sewer Board.

In October 1972, the court approved and adopted a plan resolving all then pending matters.[1] The plan, now known as the "October 1972 Plan," provided for extensive systemic relief. The plan contained general prohibitions against race discrimination in all departments of the city. The plan also identified three major areas for redress. First, the plan provided for review of the work performed by city employees to determine whether reclassification of jobs was necessary to provide more equal wages and benefits for the performance of equal or substantially similar work. As part of that review, all "unclassified laborers" became "classified laborers." The reclassification entitled these employees to all rights and benefits received by other classified employees. In addition, the promotion possibilities from the labor service were greatly expanded. Second, the plan addressed recruitment practices, minimum qualifications and standards, and selection procedures for entry-level jobs in all

---

1. Order of October 2, 1972.

departments. The plan provided for enhancement of recruitment targeted at African–Americans, and the plan required that the standards and procedures used for jobs in all departments meet federal and state-law requirements. New eligibility lists were created for all jobs throughout the city for which the Personnel Board maintained such lists. Third and finally, the defendants were required to maintain recruiting records, employment advertisements, applications, and other employment records, which were then to be available for review by the United States. The defendants were required to submit to the court and the United States semi-annual reports which set forth the work-force representation of African–Americans and other employees in all job categories of the city, the number of individuals, by race, hired into each such job category during the reporting period, and the number of individuals hired into and promoted from classified laborer positions during that period.

The order approving the plan stated that the court would retain jurisdiction for purposes of modification of the order, including the terms of the plan, and for issuing such further orders as might be expedient. The order also provided for the dissolution of the plan after five years at the defendants' request and upon a showing that there has been both "substantial compliance" with the plan and an achievement of its "basic objectives."

### B. January 1979 Consent Decree

On January 31, 1977, the United States filed a motion for supplemental relief and modification of the October 1972 plan. The United States charged, based on records of applicant flow and entry-level appointments and promotions, that the defendants had continued to discriminate against African–Americans; the United States alleged that insufficient numbers of African–American applicants had been hired and promoted into certain jobs.

In January 1979, following discovery and negotiations, the parties submitted to the court a proposed consent decree resolving

the issues raised in the 1977 motion. The court approved the proposed decree, now known as the "January 1979 Consent Decree." [2] The decree addressed solely the claims related to the Montgomery Police Department. Part I prohibited the defendants from discriminating on the basis of race in all employment practices related to the Police Department, and parts II through VII addressed the parties' entry-level hiring concerns in the department. In part VII, the defendants agreed to supplement the reports required by the October 1972 Plan with more detailed, additional semi-annual reports summarizing, by race, the processing of applicants for the job of entry-level police officer, including a breakdown of all applicants participating in each of the screening components of the hiring process.

### C. March 1979 Agreement

Later in 1979, the court approved an agreement resolving all remaining issues raised in the 1977 motion. [3] The agreement, now known as the "March 1979 Agreement," addressed jobs in all city departments, including the Montgomery Police Department. The agreement incorporated fully the October 1979 Consent Decree, reaffirmed the court's continuing jurisdiction, and again prohibited the defendants from engaging in any employment practice that discriminated on the basis of race. The agreement then set out a process, now completed, to implement a new selection procedure for entry-level firefighter position in the Montgomery Fire Department; the defendants also agreed to submit to the United States detailed semi-annual reports on the processing of applications for that job. The defendants also agreed to submit the following to the United States: detailed semi-annual reports, including information on the processing of applications by race and department, for each job classification for which a register was compiled; and similar detailed information on 19 enumerated jobs for which the United States in its 1977 motion claimed a shortfall of African–Americans appointments. Finally, the defendants agreed to submit similar detailed infor-

---

2. Order of January 30, 1979.

3. Order of March 29, 1979.

mation for every register prepared for promotional sworn positions in the Montgomery Police Department and the Montgomery Fire Department.[4]

### D. *Intervention by Sidney Williams*

In September 1978, Sidney Williams, an African–American city police officer, intervened in this lawsuit, claiming, among other things, that the Police Department had denied him a promotion to sergeant in retaliation for contacting the United States Department of Justice and because of racially-discriminatory employment procedures. In 1979, the court held that the written examination for promotion to police sergeant had an impermissible "disparate impact" on black officers in violation of Title VII.[5] The court enjoined the defendants from future use of the test, or any other test or procedure with disparate racial impact, unless and until the test or procedure has been validated in accordance with federal law; the court, however, denied Williams any individual relief. A year later, the court dismissed Williams as a named party.[6]

### E. *The Jordan Litigation*

In 1986, in *Jordan v. Wilson*, 649 F.Supp. 1038 (M.D.Ala.1986), a case that became a companion case with the instant one, the court was confronted with charges of gender discrimination in the Police Department as well. In response to a complaint-in-intervention brought by Sandra M. Pierce–Hanna on behalf of herself and other female officers, the court certified Pierce–Hanna as a class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure,[7] and held that the Police Department's promotion procedures had an impermissible "adverse impact" on women and that the department had systematically and intentionally discriminated against female officers in promotions, in violation of Title VII and the equal protection clause of the fourteenth amendment.[8] The court found that "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department." [9] The court ordered the department to develop new promotion procedures.[10]

In May 1987, because the parties were unable to agree on new procedures, the court fashioned and ordered implemented an interim promotion plan for the Police Department.[11] The relief applied to both *Jordan* and the instant case.[12] The interim plan required, among other things, that promotions were to have no adverse impact on either African–American or female candidates, measured in accordance with the "four-fifths rule" of the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D).[13] In addition, under the plan, the mayor had to make his promotion selection from among the five highest-ranked candidates, and if the mayor chose to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved were black or women, he had to state in writing his reasons for rejecting the higher-ranked candidate. Pierce–Hanna, on behalf of herself and other female officers, was then given a period of time to challenge the rejection as sexually discriminatory or retaliatory. If an objection was made, the mayor could not select the lower-ranked candidate unless

---

4. On March 29, 1979, the court entered another consent decree covering the Water Works and Sanitary Sewer Board. The central objective of the decree was to facilitate the hiring and promotion of African–American applicants to jobs within the Water Works and Sanitary Sewer Department. By order entered on April 15, 1993, the court, at the request of the United States and the Water Works and Sanitary Sewer Board, dissolved this decree.

5. Order of April 30, 1979.

6. Order of April 2, 1980.

7. *Jordan v. Swindall*, 105 F.R.D. 45, 46 (M.D.Ala. 1985).

8. *Jordan v. Wilson*, 649 F.Supp. 1038 (M.D.Ala. 1986).

9. *Id.* at 1058.

10. *Id.* at 1063.

11. *Jordan v. Wilson*, 667 F.Supp. 772 (M.D.Ala. 1987).

12. *Id.* at 774.

13. *Id.* at 777.

and until the court ruled in the mayor's favor on the challenge.[14] The interim plan was intended to last only twelve months.[15]

In March 1988, Pierce–Hanna and the defendants were able to reach agreement as to all individual claims in the *Jordan* case. The agreement was embodied in a consent decree.[16]

In the meantime, in January 1988, the court appointed counsel for all African–American officers in the Police Department and invited the officers to come forth with one or more named representatives to intervene in the instant case and to represent and pursue the interests of the officers as a class.[17] In addition, in response to a request from the defendants, the court invited all white male police officers to participate in the *Jordan* case and in the instant case, and the court appointed counsel to represent them.[18] In March 1988, Sidney Williams, Edward McCurdy, Frank L. Brown, and William Dunn were allowed to intervene in the instant case to pursue claims of race discrimination on behalf of African–Americans, and that same month Gordon M. Ledbetter and John M. Shumway were allowed to intervene on behalf of white males in both the instant case and the *Jordan* case.[19] Finally, in 1988, the court certified two classes: the "Williams intervenors" in the instant case to represent all present and future black police officers in the Police Department, with the class represented by plaintiff-intervenors Williams, McCurdy, Brown, and Dunn; and the "Ledbetter intervenors" in the *Jordan* case and the instant case to represent all present and future white male police officers in the Police Department, with the class represented by defendant-intervenors Ledbetter and Shumway.[20]

In May 1989, in response to a motion for declaratory relief filed by the City of Montgomery, the court held that a proposed promotion of an African–American police officer to rank of lieutenant was in conformity with the court-ordered interim promotion plan,[21] and the Eleventh Circuit affirmed the holding.[22] In addition, in April 1990, in response to a motion filed by Pierce–Hanna, the court held that the promotion of six males and no females to captain during the period of enforcement of the interim plan did violate plan provisions prohibiting adverse impact on female officers.[23] The court required the defendants to promote a female police officer to the rank of captain within 21 days.[24]

In 1989, the litigation in the *Jordan* case and in the instant case resumed in full bloom. That year, one of the Police Department's deputy chiefs announced that he intended to retire. Then, the department had two deputy chiefs: one supervised the "operations" side and the other the "staff" side of the department. In general, the operations side of the department covered direct law-enforcement procedures and included the patrol and investigative divisions, while the staff side was more administrative in character. Below the deputy chiefs were the majors, who each commanded a division within the police department. Each major reported directly to one of the deputy chiefs. The retiring deputy chief supervised the "staff" side of the department. The Chief of Police appointed Roger Owens, a white male, as "deputy-chief designate," to assume the new position when the retiring deputy chief left on September 29, 1989.

In June 1989, in response to challenges made by two black officers and two female officers to the appointment, the court prelim-

14. *Id.*

15. *Id.* at 781.

16. Order of March 17, 1988.

17. *Sims v. Montgomery County Commission,* 686 F.Supp. 878 (M.D.Ala.1988).

18. Order of February 9, 1988.

19. Orders of March 1 and 16, 1988.

20. Order of April 4, 1988.

21. *United States v. City of Montgomery,* 731 F.Supp. 436 (M.D.Ala.1989).

22. *United States v. City of Montgomery,* 900 F.2d 265 (11th Cir.1990) (table).

23. *United States v. City of Montgomery,* 744 F.Supp. 1089 (M.D.Ala.1990).

24. *Id.* at 1091.

inarily found that the Police Chief had appointed Owens, and had refused to consider and select any of these four other police officers in retaliation for the four officers' prior participation in this litigation.[25] The court entered a preliminary injunction requiring that the Mayor and the Police Chief develop an interim selection plan that would allow all eligible officers, including Owens, to compete for the deputy chief position without regard to a candidate's sex, race, or connection with this litigation. The court vacated the appointment of Owens pending court resolution of the challenges to the appointment. Owens was allowed to continue in the position on an acting basis, however.

In August 1989, the court entered a memorandum opinion and injunction making final its earlier preliminary finding of retaliation against the complaining two black and two female officers. The court concluded that the Police Chief "intended to choose only someone for deputy chief who had not in the past participated in lawsuits challenging the employment practices of the police department." [26] The court continued its injunction against the appointment of Owens and continued its requirement that the Mayor and the Police Chief develop an interim plan for selection of deputy chief.[27] The defendants appealed, and the Eleventh Circuit Court of Appeals affirmed the court's final injunction.[28]

In early 1990, in response to another challenge filed by Pierce–Hanna on behalf of a fellow officer, Tommi Lee Alford, the court held that the Police Chief had refused to promote Alford to the rank of captain "because of her prominent role in this litigation." [29] The court required the defendants to promote Alford.[30] The defendants appeal-

ed and the Eleventh Circuit affirmed the court's decision.[31]

In August 1990, after the Eleventh Circuit had affirmed the final order requiring that the defendants establish new procedures for selecting a new deputy chief, this court approved and adopted an interim selection plan for deputy chief.[32] The plan was substantially parallel to the court-ordered interim-promotion plan previously adopted for ranks below that of deputy chief, with the exception that its reach was expanded to allow black officers, as well as female officers, to seek immediate court relief should the defendants discriminate or retaliate against them. Paragraph 7 of the deputy-chief plan provided that, "If the mayor passes over a higher-ranked candidate for a lower-ranked candidate, he has to state his reasons for doing so in writing." The female police officers and the black police officers were then given a period of time to challenge the rejection as either sexually or racially discriminatory or retaliatory. Paragraph 7 further provided that, if there was a challenge to a selection, the mayor could not select the lower-ranked candidate unless and until the court ruled in the mayor's favor on the challenge.

More recently, in July 1991, in response to another claim filed by Pierce–Hanna on behalf of other members of the female class, the court held that the defendants had, in bad faith, refused to comply with two aspects of a 1988 consent decree resolving the individual claims of female class members in *Jordan.*[33] First, the decree required the defendants to promote one female to lieutenant and another female to captain in 1990.[34] The defendants argued that, although the consent decree required that they make the pro-

**25.** Orders of June 21, 1989 in both *City of Montgomery,* civil action no. 3739–N, and *Jordan,* civil action no. 75–19–N.

**26.** *United States v. City of Montgomery,* 744 F.Supp. at 1080–81.

**27.** *Id.* at 1088.

**28.** *United States v. City of Montgomery,* 911 F.2d 741 (11th Cir.1990) (table).

**29.** *United States v. City of Montgomery,* 755 F.Supp. 1522, 1531 (M.D.Ala.1990).

**30.** *Id.*

**31.** *United States v. City of Montgomery,* 934 F.2d 1265 (11th Cir.1991) (table).

**32.** Order of August 3, 1990.

**33.** *United States v. City of Montgomery,* 770 F.Supp. 1523 (M.D.Ala.1991).

**34.** Order of March 17, 1988.

motions, they had no obligations to do so because no plan for promotions had been developed and the consent decree did not expressly require that they develop a plan. The court rejected the defendants' argument as "frivolous and disingenuous."[35] The court wrote that "It ... logically and obviously follows that, if a plan had to be developed to make the promotions, it was the defendants' responsibility to do so."[36]

Second, the 1988 consent decree required that the defendants promote two other named female officers to the rank of sergeant in 1990. The defendants argued that they had not promoted the two officers because of their substandard performance.[37] In rejecting the defendants' argument, the court relied on an earlier opinion in which the court had specifically instructed the defendants as to when and under what circumstances they might decline to promote an officer in the face of an order or consent decree that required that they do so. The court wrote that it had previously instructed the defendants that "In the future ... the defendants must seek formal court approval before taking any action which conflicts with any of the orders of the court."[38] In "flagrant disregard of this language and of their obligation under the 1988 consent decree," the court continued, "the defendants refused to promote [the two officers] in 1990 without obtaining prior approval of the court."[39] "The defendants have not attempted to justify, or even explain, their actions," the court stated, but rather they "have approached this litigation as if the above cautionary instructions by the court did not exist."[40] The court characterized "the defendants' actions toward the required 1990 promotions [as being] part of a pattern of conscious disregard and violation of the orders of this court."[41]

In the spring of 1991, after almost another year without activity, Pierce–Hanna complained to the court on behalf of the class of female officers that the Mayor and the Police Chief were intentionally delaying implementation of the deputy-chief interim-selection plan in order to keep Owens as acting deputy chief. In July 1991, the court entered an order requiring that the Mayor and the Police Chief complete forthwith the ranking of the candidates for the position of deputy chief by July 31, 1991. The Mayor and the Police Chief requested, and the court approved, a plan authorizing the Police Department to have the rankings done under the auspices of an outside assessment group.

In early August 1991, the outside assessment group completed its rankings, which, according to the group, the Police Department could reliably use to conclude that a candidate who ranked higher than another was, in fact, overall more qualified under the criteria used by the group. Pierce–Hanna ranked first and Owens ranked second. The Police Chief, however, passed over Pierce–Hanna and recommended that Owens receive the appointment. The Mayor approved the recommendation. The Mayor and the Police Chief then had the city pay Owens $7,000 in backpay, that is, the additional amount he would have received had he assumed the position on an permanent basis on September 29, 1989. They did this even though ¶ 7 of the selection plan expressly provided that "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge" and even though the Montgomery City–County Personnel Board had refused to confirm the reappointment because the board believed the reappointment violated ¶ 7.

As was to be expected, Pierce–Hanna quickly responded to the reappointment by filing a challenge, charging that the Mayor and the Police Chief had passed over her and

**35.** *United States v. City of Montgomery*, 770 F.Supp. at 1526.

**36.** *Id.*

**37.** *Id.* at 1527.

**38.** *Id.* at 1528 (emphasis omitted) (quoting *Jordan v. Wilson*, 755 F.Supp. 993, 1001 n.13 (M.D.Ala.1990)).

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

selected Owens because of her gender and because of her participation in this litigation. On October 3, 1991, the court entered an order requiring that the defendants vacate Owens's appointment pursuant to ¶ 7 of the interim selection plan.[42] The court found the defendants' argument—that the selection plan did not apply to the reappointment—to be "disingenuous."[43] After noting that even the City–County Personnel Board had refused to process Owens's reappointment because it obviously violated the selection plan, the court reaffirmed the need for the plan: The "evidence before the court reflected that [the Mayor and the Police Chief] had engaged in a continuous pattern of discrimination and retaliation against female officers, against those who participated in this litigation, and, in particular, against Pierce–Hanna, all in violation of court orders."[44] In March 1992, the court issued a memorandum opinion and final judgment, holding that the evidence was overwhelming that Pierce–Hanna was a victim of retaliation.[45] The court required that the Mayor and Police Chief appoint Pierce–Hanna as the new permanent deputy chief.[46] Later, in April 1992, the interim plan for selection of a deputy chief was made permanent.[47]

### F. *The Sergeant's Examination*

In late 1989, the City of Montgomery submitted to the court a proposed new permanent plan for promotions to the rank of sergeant in the Police Department. The plan included both a written scored test and a structured oral interview to assess or measure a candidate's attributes. Based on the combined scores on the written test and oral interview, the candidates were then grouped within "bands" to guard against over interpreting small differences and to reflect that the selection procedures—like all selection procedures—did not measure everything.

Candidates within each band were considered equally qualified. Under this banding approach, each band was to be exhausted in turn, beginning with the band containing the highest scores.

Over objections from the Williams intervenors and the Ledbetter intervenors and despite the fact that the sergeant selection procedures had a racially disparate impact on African–American candidates,[48] the court found the written test and oral interview aspects of the procedures were "valid" under Title VII and thus could be used by the Police Department.[49]

The Ledbetter intervenors and the United States also complained that the Police Department had no formalized procedure for making selections from within bands. The lack of formalized procedures, according to them, invited arbitrariness. The Police Department responded that it had asked its experts to develop a training program to help guide the department in making selections from within bands. The training was to be designed to help the department avoid common rating biases and focus its attention on those abilities that are important for sergeants but were not capable of being measured by the written test and the oral interview. Furthermore, because these additional guidelines developed for the department would necessarily be subjective ones that would be difficult if not impossible to validate, the department agreed to avoid adverse impact for selections from within bands.[50] The court held, for two reasons, that the "issue of within-band selections [was] not ripe for resolution."[51] First, the evidence reflected that, "Given that only white males remain in Band B, the only band from which further promotions are likely, it is unlikely that an issue about promotions from within the bands will arise in the con-

---

42. Order of October 3, 1991.

43. *Id.* at 10.

44. *Id.* at 11.

45. *United States v. City of Montgomery*, 788 F.Supp. 1563 (M.D.Ala.1992).

46. *Id.*

47. Order of April 21, 1992.

48. *United States v. City of Montgomery*, 775 F.Supp. 1450, 1456 (M.D.Ala.1991).

49. *Id.* at 1456–59.

50. *Id.* at 1459.

51. *Id.*

text of this employment discrimination lawsuit." [52] And second, "Because the police department has yet to develop these additional guidelines, neither the parties nor the court can evaluate them." [53]

### G. Permanent Procedures for Promotions within the Police Department

In October 1992, the court approved the Personnel Board's proposal of permanent procedures for promotions within the Police Department.[54] The procedures provided methods for certification by the Personnel Board of candidates for promotion to particular ranks within the Police Department. The Department would then select from among those candidates, and all parties would be informed of its choices, including the race and gender of the preferred candidates. The procedures did not cover appointments to positions as mayoral-aides. The parties would have seven days to lodge complaints with the court, and, if there were none, the board could implement the promotions. The promotion lists generated by these procedures were to be in place for only two years, after which new lists would be drawn up under the procedures.[55]

### H. Permanent Nondiscriminatory Policies and Procedures for Transfer and Internal Complaints within the Police Department

In November 1992, the court issued a pair of orders. The first one approved the Police Department's proposed policies and procedures for dealing with internal complaints charging race or sex discrimination, and related complaints, such as retaliatory treatment.[56] The other approved a proposed assignment and transfer procedure developed by the Personnel Board, which was responsive to an order requiring them to "develop ... non-discriminatory policies and procedures regarding transfers, initial assignments, training and education, and career

counseling." [57] Neither proposal had met with any objections from any other party.

### I. Permanent Nondiscriminatory Policies and Procedures regarding the Assignment of Police Officers as Mayoral Aides

In February 1993, the court approved a permanent policy and procedure regarding the assignment of police officers as aides to the Mayor, this position having been excluded in the procedures adopted in the October 1992 order.[58] Under the policy, the Chief of Police would nominate qualified candidates for appointment without regard to race or gender, and the mayor would select from among those nominees and assign them to specific details on the same nondiscriminatory basis. The program further allowed for monitoring of and challenges to appointment or to the procedure itself.

### J. Modifications of Transfer Procedures

In May 1996, the city moved the court to modify the November 1992 order establishing the transfer policy within the Police Department. The only change was to permit employees to initiate transfer requests at any time after serving two years with the division or department from which they seek transfer. After no party objected in response to a show cause order by the court, the modification was adopted in June 1996.[59]

### K. 1996 Proposal for Termination

In May 1996, the court invited the parties to prepare and submit a joint proposal for the termination of the instant lawsuit.[60] The parties responded on August 2, 1996, by moving jointly for dissolution of the October 1972 Plan and the January 1979 Consent Decree, and for modification of the March 1979 Agreement insofar as it affects the Police Department and the Fire Department.

In addition, as required by Rule 23(e) of the Federal Rules of Civil Procedure, the court had counsel notify all members of the

52. Id.

53. Id.

54. Order of October 5, 1992.

55. Id.

56. Order of November 2, 1992.

57. Order of November 2, 1992.

58. Order of February 24, 1993.

59. Order of June 24, 1996.

60. Order of May 21, 1996.

Police Department, including the classes represented by the Williams intervenors and the Ledbetter intervenors, about the proposed dissolution and modification, and of the right of the individual class members to file written objections to the proposal in advance of the fairness hearing. The court conducted a fairness hearing on September 20, 1996, at which time it heard no objections to the proposed dismissal of this action. The court also received no written objections from class members prior to the hearing.

### L. *James v. City of Montgomery*

After the fairness hearing, in *James v. City of Montgomery*, No. 95–6086, the Eleventh Circuit Court of Appeals affirmed a jury verdict out of this court finding that the City of Montgomery had subjected a black police officer to "a racially hostile environment." More specifically, the appellate court observed that, "Reviewing the record in the light most favorable to the verdict," the evidence reflected that the appellant black police officer's "superiors made remarks to him indicating their hostility towards blacks and their lack of motivation toward protecting the citizens of predominantly black communities" and that "they followed a general practice of assigning officers to different communities based on the officers' races."

By order entered on October 8, 1996, in response to the appellate opinion, this court required that the parties submit statements indicating, first, whether this court should consider these appellate observations and, second and if so, how the court should consider these observations. Based on the responses received from the parties, the court concluded that these new matters, to the extent that they are relevant to this litigation, can still be raised under the modifications to the March 1979 Agreement. The parties agreed that they needed time to look into whether the circumstances identified in the *James* lawsuit were isolated and unlikely to recur. The court therefore concluded that dissolution of the October 1972 Plan and the January 1979 Consent Decree and the approval of the modifications to the March 1979 Agreement would not foreclose consideration of such matters to the extent they are relevant to this litigation.

## II. DISCUSSION

### A. *Dissolution Requirements*

It goes without saying that local autonomy of police departments is a " 'vital national tradition.' " *Freeman v. Pitts,* 503 U.S. 467, 490, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) (quoting *Dayton Bd. of Education v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977)). Returning governmental entities to the control of local authorities "at the earliest practicable date is essential to restore their true accountability to our governmental system." *Id.* Therefore, in addressing any statutory or constitutional violation by a police department or any other local governmental entity, a court's "end purpose" must be to remedy the violation and then to restore authority to the local entity that is "operating in compliance" with federal, state, and constitutional law. *Id.*

In making the determination of whether to terminate relief and restore full control to a governmental entity, a court should be informed by, at least, the following three considerations: first, whether there has been full and satisfactory compliance with the court's outstanding orders; second, whether retention of judicial control is necessary or practical to achieve compliance with any outstanding orders; and third and finally, whether the governmental entity has demonstrated to the public and to those of the disfavored group its good-faith commitment to the whole of the court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446 (articulating these factors in the context of a long-standing school desegregation case). In considering these factors, a court should give particular attention to the governmental entity's "record of compliance." *Id.* A local government is better positioned "to demonstrate its good-faith commitment" to a constitutional course of action when its policies exhibit a consistent pattern of lawful conduct directed at eliminating earlier violations. *Id.*

The October 1972 Plan, the January 1979 Consent Decree, and the March 1979 Agreement did not establish any specific goals or timetables for compliance. Rather, because the simple objective of each agreement was to prevent discrimination on the basis of race, the United States monitored adverse impact against African–American applicants by reviewing the information submitted in each semi-annual report upon its receipt and by, at various times, requesting and reviewing supplemental recruitment or application data. Moreover, neither the October 1972 Plan, the January 1979 Consent Decree, nor the March 1979 Agreement identified a particular benchmark by which the court was to determine whether the objectives of any one of the settlements had been accomplished. Rather, ¶ 4 of the order adopting the October 1972 Plan stated that, "at any time after five years subsequent to the date of entry of this order, the defendants or any of them may move this Court, on due notice, for dissolution of this order, and in considering whether the order shall be dissolved, the Court will take into account whether Defendants have substantially complied with this order and whether the basic objectives of this order have been achieved." The parties have informed the court that they agree that the same standard, which echoes the first consideration articulated by the court above, should be applied to dissolution of the January 1979 Consent Decree and modification of the March 1979 Agreement.

The evidence reflects, based on the information provided in reports submitted over the last 24 years, that the basic objectives of the October 1972 Plan have been achieved. Many of the plan's requirements relating to classification, such as changes in wages and benefits for laborers, took place near the time the plan was entered in 1972. Other systemic changes, such as increased promotion opportunities from the labor services following reclassification, have now been available to employees for over 20 years, and the procedures established by the plan to notify potential applicants of openings in all departments are now incorporated into the defendants' standard recruitment-and-hiring processes.

The evidence further reflects that the basic objectives of the January 1979 Consent Decree have been achieved. The defendants have consistently maintained records and submitted timely reports as required. The defendants' recruiting efforts have resulted in proportionately greater numbers of African–American applicants, and the defendants' employment standards and selection procedures have generally not resulted in adverse impact after the defendants began submitting detailed reports following the entry of the January 1979 Consent Decree and the March 1979 Agreement.

The evidence further reflects that the basic objectives of ¶ 4 of the March 1979 Agreement have been achieved. The paragraph called upon the defendants to utilize an entry-level testing procedure for the firefighter position that was fair to all applicants and had little or no adverse impact on African–American applicants. The procedure was adopted in the early 1980's. The evidence further reflects that the basic objectives of the remaining provisions in the March 1979 Agreement have been achieved for jobs in all departments other than the Police Department and the Fire Department. The parties agree that further monitoring under the March 1979 Agreement is needed of certain positions in the Police Department and the Fire Department. The United States needs additional time to review the validity of hiring and promotional procedures in these two departments. There are also a number of orders—aside from the October 1972 Plan, the January 1979 Consent Decree, and the March 1979 Agreement—for which the defendants have yet to demonstrate full compliance. Therefore, with regard to both the Fire Department and the Police Department, ¶¶ 1, 2, 3, 5, 6, 7, and 8 of the March 1979 Agreement should be modified to refer solely to sworn or uniformed positions in the Montgomery Police Department and Montgomery Fire Department for the limited time that certain other provisions of the agreement need to remain in effect.[61]

---

**61.** In their brief submitted on August 2, 1996, the parties are unclear regarding the continued need for ¶¶ 6 and 7. On page 13 of their brief, they state that these two paragraphs should be modi-

With regard to the Fire Department alone, the parties agree that the March 1979 Agreement should be modified to provide for continued jurisdiction of any motion to enforce its terms; for the continuation of the confidentiality agreement of the United States; and for reporting requirements as to entry level and all promotional positions in the sworn ranks. The Personnel Board has recently provided the United States with documentation relating to the validity of the current selection procedures for all uniformed promotional ranks in the Fire Department. Once the United States has received its validity documentation, it will confer with the city and the Personnel Board as to the proposals, if any, for modified use of these procedures. The parties believe that this review and consultation process can be completed by December 31, 1996.

The proposed modifications as to the Police Department are much more extensive. First, the March 1979 Agreement should continue to provide for jurisdiction of any motion to enforce its terms; for coverage of the entry-level police officer position and continuation of the confidentiality agreement of the United States; and for reporting requirements for the entry level and all promotional positions in the sworn ranks of the Police Department.[62]

Second, under an order entered in October 1992, the city and the Personnel Board are required to follow certain steps in the development of selection procedures for pro-

motional positions in the sworn ranks in the Montgomery Police Department. These procedures require that other parties, including the Williams intervenors and the Ledbetter intervenors, respond within certain time frames to information provided by the city and the Personnel Board. These procedures further limit to two years the life of the eligibility list for ranks of sergeant, lieutenant, captain, and major resulting from newly-developed selection procedures. The city's testing expert has developed, and the city and Personnel Board have implemented, a complete set of selection procedures covered by the October 1992 order, and a second such procedure for the rank of sergeant.[63] Currently, the city's testing expert is developing new procedures for lieutenant and captain. The city and Personnel Board anticipate that the new procedures for these two ranks will be implemented, with the initial selections made in each rank based on the results of these procedures, by February 1997.

Third, the United States remains concerned about the "banding" aspect of the Police Department's promotional procedures. The United States has sought to formalize the process of making selections from within bands. *See United States v. City of Montgomery,* 775 F.Supp. 1450, 1456, 1459 (M.D.Ala.1991). Although the United States understands that the city's testing expert has now provided some guidance to the city as to how such selections can be made in a job-related manner, the United States has not

fied to apply only to the Police Department and the Fire Department. However, on page 14 of their brief, they suggest that, of the three paragraphs—6, 7, and 8—only ¶ 8 need be continued in force as to the two departments, and their proposed order for entry by the court provides that ¶ 6 should be dissolved, and there is simply no reference to ¶ 7 at all. The court has resolved this ambiguity in favor of keeping both ¶¶ 6 and 7. If the paragraphs are due to be dissolved, the dissolution can take effect within the time frame provided in the proposed modifications to the March 1979 Agreement.

**62.** Although the agreement does not set forth explicit record-keeping requirements that match those in the October 1972 Plan and the January 1979 Consent Decree, the defendants are still subject to the record-keeping requirements of the Uniform Guidelines on Employee Selection Procedures. These obligations include requiring

that an employer maintain "records or other information" which would disclose the impact which its tests and other selection procedures have upon employment opportunities of persons by identifiable race, sex, or ethnic group[s]. 29 C.F.R. § 607(4)(A). The parties believe that these obligations, along with the modified reporting requirements of ¶¶ 6, 7, and 8 of the agreement, will provide a sufficient basis for continued monitoring of those sworn positions in the Police Department for which the parties believe the agreement should remain in effect for a specific period.

**63.** As stated, the job relatedness of the first promotional selection procedure developed for the rank of police sergeant was litigated prior to the entry of the order of October 1992. *United States v. City of Montgomery,* 775 F.Supp. at 1456.

received any documentation related to the guidance. Based on the city's description of the methodology it has utilized, after receipt of guidance, in one promotional process, the United States believes that, once it has reviewed the documentation, it will still likely ask the city to ensure impartiality and the perception of impartiality in selecting from within bands. The parties believe that this review and consultation process should be completed by December 31, 1996.

Fourth, in June 1996, the court allowed the city to modify its transfer and assignment policy for sworn positions within the Montgomery Police Department. The parties have agreed to attempt to resolve among themselves other similar modification requests that might arise before the expiration of the March 1979 Agreement so that only those matters on which the parties cannot first reach agreement would be presented to the court.

Finally, as to both the Fire Department and the Police Department, the parties believe that all obligations under the March 1979 Agreement, as they have requested that it be modified, can be fulfilled and its goals achieved by the end of December 1996 as to the Fire Department and by the end of February 1997 as to the Police Department. Therefore, the parties ask that the March 1979 Agreement remain in effect through only February 28, 1997. The parties further request, however, as to both the Police Department and the Fire Department, that they should be allowed, within 30 days prior to the termination of jurisdiction, to make any appropriate motions regarding whether circumstances warrant the court's retention of jurisdiction for any longer period of time.

With one exception, however, the parties do not directly address the fact that, if the court approves the proposed termination plan, numerous other outstanding orders in this litigation relating to the Police Department would be dissolved as well. For example, the October 1992 order (approving permanent promotion procedures in the department), the November 1992 and June 1996 orders (approving permanent policies and procedures for transfers, assignments, and internal complaints in the department),

the April 1992 order (approving a permanent plan for the selection of deputy chief), and the February 1993 order (approving policies and procedures for assignment as mayoral aides) would all be dissolved. The one exception is from counsel for the Williams intervenors who voiced a concern that, although permanent procedures have been adopted for the selection of deputy chief, the defendants have yet to fill out, or provide needed details about, the procedures; in particular, they have not articulated what criteria will be used in making the selection. The Williams intervenors observe that an African–American has never served as a deputy chief. The court must note its disappointment that counsel for the United States—who was the principal draftsperson of the proposed termination plan—completely failed to address this concern in the brief submitted in support of approval of the termination plan. Nevertheless, the court assumes that the parties will address these matters as well during the period before termination of this litigation.

Relying on the above observations and with the above concerns or reservations in mind, the court agrees with the parties that there has been full compliance with the provisions in the October 1972 Plan, the January 1979 Consent Decree, and the March 1979 Agreement that the parties seek to have terminated. The first factor—whether there has been full and satisfactory compliance with the court's outstanding orders—has been satisfied. The second and third factors—whether retention of judicial control is necessary or practical to achieve compliance with outstanding orders, and whether the governmental entity has demonstrated to the public and to those of the disfavored group its good-faith commitment to these orders—have been satisfied as well with regard to the provisions in the October 1972 Plan, the January 1979 Consent. Decree, and the March 1979 Agreement that the parties seek to have terminated.

However, the same cannot be said with regard to all other outstanding orders—in particular, the October 1992 order (approving permanent promotion procedures in the Police Department), the November 1992 and

June 1996 orders (approving permanent policies and procedures for transfers, assignments, and internal complaints in the department), the April 1992 order (approving a permanent plan for the selection of deputy chief), and the February 1993 order (approving policies and procedures for assignment as mayoral aides). Indeed, up through 1992, the court repeatedly chastised the City of Montgomery and its Mayor and Police Chief for their conduct toward this litigation. For example, in October 1991, the court wrote that the Mayor and Police Chief had "engaged in a continuous pattern of discrimination and retaliation." [64] Earlier in 1991, the court characterized the Mayor and the Police Chief's actions toward an order of the court as being "part of a pattern of conscious disregard and violation of the orders of this court." [65] The defendants' conduct in this litigation has therefore at times been flagrantly contemptuous.

Admittedly, there is an absence of proof that, after 1992, the defendants have violated any of these other orders. However, an absence of proof does not necessarily equate to a proof of absence. That the parties have failed to submit (that is, that there is an absence of) proof of non-compliance does not necessarily mean that there has, in fact, been an absence of non-compliance (that is, that the defendants have complied). Instead, as the Supreme Court has made clear, the party seeking termination must present a "record of compliance." *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446; it must "demonstrate its good faith commitment" to a lawful course of action. *Id.* Here, the parties have failed to submit an affirmative record of the defendants' compliance with these other outstanding orders.

The court will therefore require that the parties demonstrate that all other outstanding orders—in particular, the October 1992 order (approving permanent promotion procedures in the Police Department), the November 1992 and June 1996 orders (approving permanent policies and procedures for transfers, assignments, and internal complaints in the department), the April 1992

order (approving a permanent plan for the selection of deputy chief), and the February 1993 order (approving policies and procedures for assignment as mayoral aides)— should be dissolved as well at this time. The court assumes that the parties will be able to supplement the record with such a showing before February 28, 1997.

### B. *Modification Standards*

The proposal for modifications of the March 1979 Agreement must also be measured against the legal standards for modifications of court-adopted agreements. Modification of a court-adopted agreement or consent decree, like modification of any judgment or order, is formally governed by Rule 60(b) of the Federal Rules of Civil Procedure. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 380, 112 S.Ct. 748, 757, 761, 116 L.Ed.2d 867 (1992). Rule 60(b) authorizes a court to modify a final judgment or court order at any time if it finds that "the judgment has been satisfied, . . . or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application, or [for] any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(5)–(6).

Traditionally, courts had required parties seeking modification of a consent decree under Rule 60(b) to demonstrate that continued application of the decree would result in "grievous wrong" on account of new and unforeseen conditions. *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). In recent years, however, the *Swift* standard has been rejected as too rigid for "institutional reform litigation." *See, e.g., Hodge v. HUD,* 862 F.2d 859 (11th Cir.1989) (per curiam); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); *Philadelphia Welfare Rights Org. v. Shapp,* 602 F.2d 1114 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). The Supreme Court's decision in

**64.** Order of October 3, 1991, at 11.

**65.** *United States v. City of Montgomery,* 770

F.Supp. at 1528.

*Rufo* established a two-part standard for determining when modification of such decrees is appropriate. 502 U.S. at 383–384, 112 S.Ct. at 760. First, the party seeking modification of the decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo,* 502 U.S. at 383, 112 S.Ct. at 760. The party may satisfy this initial burden "by showing either a significant change in factual conditions or in law." *Id.* at 384; 112 S.Ct. at 760. The Court identified several situations in which a significant change in factual conditions could warrant modification of a decree. Modification could be appropriate where a change in conditions has made compliance with the decree "substantially more onerous." *Id.* Modification could also be appropriate "when a decree proves unworkable because of unforeseen obstacles," or, lastly, "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* While the change in circumstances need not have been unforeseeable, it must at least have been unforeseen: "Ordinarily, ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.*

Second, if the moving party meets this standard, the court then considers "whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383, 112 S.Ct. at 760. Any modification to the decree must be directly responsive to the problem created by the changed circumstances. *Id.* at 391–392, 112 S.Ct. at 764. The *Rufo* court recognized that, in applying this two-part standard, a court must take into consideration the effect of the proposed modifications on the underlying purpose of the consent decree. Where the defendant requests a modification that is clearly designed to further the goals of the decree, for example, the court may be more flexible in its application of the two-part test. *Id.* at 381 n. 6, 112 S.Ct. at 758 n. 6. If the modification would in any manner frustrate or undermine the decree's purpose, the court must proceed with extreme caution in reviewing the justification for the proposed changes. *Id.* at 388, 112 S.Ct. at 762; *see also Hodge,* 862 F.2d at 864.

Here, there are clearly changed circumstances. Many of the provisions in the March 1979 Agreement are no longer needed except as to the Police Department and the Fire Department, and the agreement obviously needs to be modified to this extent. In addition, as stated, the modifications are needed to allow for further monitoring of certain positions in the Police Department and the Fire Department. The United States needs additional time to review the validity of hiring and promotional procedures in these two departments. There are also a number of orders—aside from the October 1972 Plan, the January 1979 Consent Decree, and the March 1979 Agreement—for which the defendants have yet to demonstrate full compliance. The proposed modifications of the March 1979 Agreement are suitably tailored to these changed circumstances.

### C. Settlement Requirements

■■■ Finally, because the proposed dissolutions and modifications are a product of settlement in a class action, the court must measure them against the legal requirements for class-action settlements as well. Voluntary settlement is the preferred means of resolving class action employment discrimination cases. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is equally well established, however, that the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is "fair, adequate, and reasonable," *id.* at 1169; for example, the interests of the class lawyer and the class may diverge, or a majority of the class may wrongfully compromise, betray or 'sell-out' the interests of a minority. *Id.* A court also has a duty to ensure that the settlement is not illegal or against public policy. *Paradise v. Wells,* 686 F.Supp. 1442, 1444 (M.D.Ala.1988).

■■■ "In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself." *Paradise,* 686 F.Supp. at 1444. Determining those views

and quantifying them in a manner that enables the court to determine whether the settlement is fair is, however, not always easy. The court should be careful "not [to] allow a majority, no matter how large, to impose its decision on the minority," *Pettway*, 576 F.2d at 1217; the court should be certain "that the burden of the settlement is not shifted arbitrarily to a small group of class members." *Id.* However, where the settlement provides for structural changes, with each class member having virtually equivalent stake in the changes, and where there are no conflicts of interest among class members or among definable groups within the class, then the decision to approve the settlement "may appropriately be described as an intrinsically 'class' decision in which majority sentiments should be given great weight." *Id.* Here, no one—from either the class of African–Americans officers represented by the Williams intervenors or the class of white male officers represented by the Ledbetter intervenors—has objected in any way, after proper notice and opportunity to respond.

▇▇▇ "In addressing whether a settlement is fair, adequate, and reasonable, a court should also consider the judgment of experienced counsel for the parties." *Paradise*, 686 F.Supp. at 1446. Here, counsel for the Williams intervenors and counsel for the Ledbetter intervenors have candidly and carefully articulated the proposed settlements' pluses and minuses. Their views are due great weight. Counsel for the Williams intervenors and counsel for the Ledbetter intervenors have vigorously and successfully pursued this case for almost two and half decades in this court and in the appellate court. No one can question in any manner their dedication to the classes they represent. *Cf. Pettway*, 576 F.2d at 1215 (court should be sensitive to potential conflict between

class and its attorneys, particularly where large attorney fees may also be at stake).

▇▇▇ "Finally, with the above considerations in mind, the court should itself assess whether the consent decree is fair, adequate, and reasonable," *Paradise*, 686 F.Supp. at 1446, as well as legal. *Id.* at 1448. For the reasons already given above and subject to the concerns articulated and conditions assumed, the court concludes as well that the proposed termination is in the best interest of the classes and is legal.

## III. CONCLUSION

In 1991, in approving, in part, the sergeant examination procedures, the court informally called upon the parties to "investigate and consider other means for resolution of this litigation."[66] The court wrote,

"In a year, this litigation will be 20–years old, and if it continues at the same pace it will be well into the next century before it comes to an end. Indeed, the court today could give only partial approval to the sergeant's promotion procedures and has yet even to consider promotion procedures for the other ranks. It is therefore evident that the parties and the court must investigate and consider other means for resolution of this litigation. Otherwise, these two cases will give a literal meaning to the figurative comment this court made a number of years ago, in another lawsuit, that 'Unlike old soldiers, cases such as the one now before the Court not only never die, they never fade away.' United States v. Frazier, 14 Empl.Prac.Dec. (CCH) ¶ 7599 at 4929 (M.D.Ala.1976) (Johnson, J.)."[67]

Five years later, in May 1996, the court formally directed the parties to submit a proposal for the termination of this litigation. The parties have now done so, with a plan that conditionally meets the approval of all, including the court.[68]

---

**66.** *United States v. City of Montgomery*, 775 F.Supp. at 1460.

**67.** *Id.*

**68.** The court's approval is conditional in the sense that the parties have yet to demonstrate that "all" orders in this litigation—in particular,

the October 1992 order (approving permanent promotion procedures in the Police Department), the November 1992 and June 1996 orders (approving permanent policies and procedures for transfers, assignments, and internal complaints in the department), the April 1992 order (approving a permanent plan for the selection of deputy chief), and the February 1993 order (approving

Indeed, the court is encouraged by the quiet efficacy of the testing mechanisms created through this litigation, which may produce their planned and desired result—acquiescence of all parties to the obsolescence of the litigation itself. Perhaps the successful conclusion of this matter may be instructive to other courts that continue to oversee class-action employment-related discrimination decrees.

An appropriate judgment will be entered.

### JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The joint motion for dissolution filed by the parties on August 2, 1996, is granted.

(2) The plan approved and enforced by order entered on October 2, 1972, is dissolved.

(3) The consent decree entered on January 30, 1979, is dissolved.

(4) The agreement entered on March 29, 1979, is modified as follows:

(A) Paragraphs 1, 2, 3, 5, 6, 7, and 8 of the agreement shall pertain only to those positions within the sworn or uniformed ranks of the Montgomery Police Department and Montgomery Fire Department.

(B) Paragraph 4 of the agreement is dissolved.

(C) Paragraphs 1, 2, 3, 5, 6, 7, and 8 shall remain in effect as to the Montgomery Police Department until February 28, 1997, so that the parties to the agreement and the Williams intervenors and Ledbetter intervenors can complete their review of the promotional selection procedures now being developed by the City of Montgomery for lieutenant, captain and major in the Police Department, resolve matters related to banding of scores from those procedures and confer on any proposals for modification of policy in the sworn ranks of the department by the defendants.

(D) Paragraphs 1, 2, 3, 5, 6, 7, and 8 shall remain in effect as to the Montgomery

Fire Department until December 31, 1996, so that the parties to the agreement can complete their review of the current selection procedures used for uniformed promotional ranks in the department.

(E) Within 30 days prior to the termination of jurisdiction of this agreement, any party may make appropriate motions regarding whether circumstances warrant the court's retention of jurisdiction for any longer period of time.

(5) Upon an evidentiary showing and submission by the parties, on or before February 28, 1997, that all other orders in this lawsuit relating to the Montgomery Police Department—including but not limited to the orders of April 21, 1992, October 5, 1992, November 2, 1992, February 24, 1993, and May 21, 1996—are no longer necessary and upon a subsequent independent finding by the court to that effect, these other orders shall be dissolved as well; otherwise these orders shall remain in effect.