**Carolyn JORDAN, etc., et al., Plaintiffs,**

**Sandra M. Pierce and Joyce S. Oyler, Plaintiff-Intervenors,**

v.

**John WILSON, etc., et al., Defendants.**

**Civ. A. No. 75–19–N.**

United States District Court, M.D. Alabama, N.D.

May 20, 1987.

773

J. Richard Cohen, Southern Poverty Law Ctr., and M. Wayne Sabel, Argo, Enslen, Holloway & Sabel, Montgomery, Ala., for Pierce and Oyler.

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for all defendants except Wade L. Moss and Montgomery City-County Personnel Bd.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Wade L. Moss and Montgomery City-County Personnel Bd.

Gregory B. Stein, Blacksher, Menefee & Stein, Mobile, Ala., co-counsel for plaintiffs and plaintiffs-intervenors.

## ORDER

MYRON H. THOMPSON, District Judge.

Previously in this class-action lawsuit, the court held, among other things, that the promotion system of the Police Department of the City of Montgomery, Alabama has had both the purpose and effect of discriminating against female police officers in violation of 42 U.S.C.A. § 1983 and 42 U.S.C.A. §§ 2000e through 2000e–17 (otherwise known as Title VII of the Civil Rights Act of 1964, as amended). *Jordan v. Wilson*, 649 F.Supp. 1038 (M.D.Ala.1986) (*Jordan I*). This cause is again before the court on the matter of the establishment of a new promotion system for the department.

### I.

In 1983 and 1984, plaintiff-intervenors Sandra M. Pierce and Joyce S. Oyler, two female police officers, filed complaints-in-intervention in this lawsuit charging that officials of the City of Montgomery and its police department had denied promotions to female officers because of their sex and had retaliated against Pierce for having initiated the charges of discrimination. In an opinion and order issued on November 17, 1986, based on a nonjury trial, the court found that the police department's promotion procedures had an impermissible "adverse impact" on women and, further, that officials of the city and its police department had intentionally used the procedures to discriminate against female police officers and to retaliate against Pierce for challenging the department's promotion procedures. *Jordan I, supra.* The court then concluded, among other things, that the department's procedures "must be changed or replaced." *Id.*, at 1062. The court, however, declined at that time to revise the procedures itself, but rather de-cided to afford the parties an opportunity "to agree on new promotion procedures that will not violate Title VII and section 1983." *Id.* The parties have been unable to agree on new procedures, and the court has therefore had to take upon itself the responsibility of refashioning the promotion system.

All parties to this phase of this lawsuit—the plaintiff-intervenors, the mayor and police chief of the City of Montgomery, and the Montgomery City-County Personnel Board—have submitted proposals to revise the department's promotion procedures. At the invitation of the court, the United States of America has also submitted a proposal. This invitation was based on the fact that any promotion system adopted by the court in this sex discrimination case must also be acceptable to the court in another suit brought by the United States charging the department with race discrimination. In *United States v. City of Montgomery*, Civil Action No. 3739–N, the court has over the years issued a number of orders prohibiting the police department from discriminating against black police officers; and, for some time now, the parties have been trying to agree to promotion procedures that comply with these orders.

The parties have informed the court that the department needs an acceptable promotion system immediately, but that it will take a year or more to develop a permanent promotion system that fully and adequately addresses all the concerns raised in this case and in the race discrimination case. They have, as a result, asked that the system adopted by the court be for interim use only.

Substantial agreement has been reached among the parties on many aspects of the interim system. All their proposals include a three-tiered system of evaluations for promotions. First, written performance evaluations are to be done by the candidates' supervisors. Second, a panel will be appointed to conduct oral interviews of the candidates and to rate the candidates based on the interviews. Third and last, candidates will be ranked based on their com-

bined scores on their performance evaluations and interviews, and the mayor will make his promotion selections from the top-ranked candidates. The parties have also agreed that the experts they have retained should work together and with the police department to make the interim plan as objective as possible. The parties, however, have also disagreed on a number of substantial matters.

## II.

■ The parties differ, first, on the size and composition of the interview panel and how panel members should be appointed. The plaintiff-intervenors recommend that the panel consist of four members, with one appointment going to the plaintiff-intervenors, one to the mayor and police chief, one to the personnel board, and one to the court. The mayor and police chief object to the court having an appointment, suggesting that a three-member panel would suffice. The court agrees. At this time, there is no need for the court to appoint someone to play a significant role in the promotion process of the police department.

The mayor and police chief also object to the personnel board's suggestion that each party be able to object to any other party's choice of a panelist. The mayor and police chief argue that no one should be barred from serving on the panel unless and until the appointee has displayed inappropriate conduct during service on the panel. The mayor and police chief agree, however, that the court should be able to remove any person who, after appointment, demonstrates bias or incompetence. The court concurs in this assessment by the mayor and police chief. Each party is expected to appoint someone who will perform competently and without bias; but, if after appointment a panel member demonstrates either bias or incompetence, the court will, after a hearing if needed, remove the member from the panel.

The personnel board has promised the court, at the strong urging of the other parties, that, if possible, it will appoint a staff member of the Montgomery City-County Personnel Department. The courts expects the personnel board to live up to this promise. The plaintiff-intervenors, the United States, and the personnel board also suggest that the three-member panel should include at least one female and one black person. The court agrees and will include this requirement in the interim plan.

## III.

■ The parties also disagree on the role the mayor should play in the selection process. State law authorizes the mayor alone to promote employees within the police department. Prior to this lawsuit, the system by which the mayor exercised his promotional authority was first triggered when a vacancy arose which the department wished to fill through promotion. The mayor would request the personnel board to provide him with either a "standard" or "selective" certification of candidates from a register compiled by the personnel board for the rank being considered. A standard certification would consist of the names of the five highest rated officers on the register for the relevant rank; a selective certification would contain the names of the five highest ranked candidates for promotion with certain requested characteristics or qualifications. The mayor could then select from among the certified candidates his choice for promotion. *See Jordan I*, at 1047 (discussing the selection process in more detail). The mayor and police chief and the personnel board suggest that the mayor retain the same role within the promotional scheme that he has had in the past. The court cannot accede to this request.

In its November 17 opinion and order, this court detailed a scenario of pervasive and deep-seated sex discrimination within the police department. As the court stated, "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department." *Jordan I*, at 1058. The court also found that the mayor, Emory Folmar, "is directly, personally, and intimately involved in the day-

to-day operations of the department, so much so that his relationship with the department is more that of a 'super-chief of police.'" *Id.*, at 1048. The court then revealed how a good many of the acts of sex discrimination in the department were directly attributable to the mayor. *Id.*, at 1058–59. The court also revealed how the mayor had concocted a department-wide scheme to discredit and embarrass plaintiff-intervenor Sandra M. Pierce for having initiated the charges that led to this lawsuit. Receiving their cue from the mayor, Pierce's supervisors suddenly began to give her extremely poor ratings, with the result that her ranking on the promotion register dropped precipitously and dramatically. *Id.*, at 1060–62. The scheme was thus not subtle and hidden, but open, obvious and widespread so that everyone in the department would see that the penalty for "disloyalty" was very great. It was based on open intimidation and had a two-fold purpose: first, to punish Pierce and force her out of the department; and, second, to encourage others in the department to join the mayor in his vendetta against Pierce and in his opposition to her lawsuit.

The scheme, however, also had an element of reward to it. On one occasion, the mayor rewarded two female officers for supporting him against Pierce, by promoting them while rejecting Pierce. As the court previously observed:

> The two women selected, however, were strong supporters of the mayor and the department in their opposition to Pierce's charges of discrimination. These women—who were no more qualified than Pierce, if not less qualified—were selected over Pierce because they did not challenge the status quo and were "loyal" to the department. The court is firmly convinced that, in his efforts to promote more women in the wake of Pierce's charges, the mayor would have also promoted Pierce but for her "disloyal" conduct.

*Jordan I*, at 1062.

A week after the November 17 opinion and order, in another order issued on November 25, the court again drew attention to its deep concern about the discrimination and retaliation in the police department. The court declined, however, to issue an order banning future sex discrimination in the department, because such an order was already outstanding in this lawsuit as a result of an earlier phase of litigation and was thus unnecessary. *Id.*, 1063–64. However, because the court was convinced "that there [was] a strong probability of further retaliation" and because an order banning such was not already outstanding, the court did issue an order prohibiting the mayor and all other police officials from retaliating against persons in the department, and in particular from retaliating against Pierce. *Id.*, at 1064. The order specifically required that the mayor and all other police officials give Pierce "the same respect, support and encouragement given to all other officers." *Id.*

Nevertheless, within two months, the mayor and police chief retaliated against Pierce again, in blatant and clear violation of the November 25 order. As this court states in a companion order entered today, holding the mayor and police chief in civil contempt of court for certain public statements they made about Pierce,

> [T]he evidence is clear and convincing to the court that the statements they made had both the purpose and effect of retaliating against Pierce. The court agrees with Pierce that the statements were specifically intended and, in fact, had the effect of demeaning her before her fellow officers and the public, as well as demoralizing her, so as to substantially impair her ability to function as an officer. The statements were a continuation of the scheme previously condemned and prohibited by the court.

*Jordan v. Wilson*, 662 F.Supp. 528, 532 (M.D.Ala.1987) (*Jordan II*).

With this history, any interim promotion system must address not only the mayor's deep-seated bias against female police officers, but it must also address his continued efforts to discourage female officers from pursuing discrimination claims and to retaliate against those who do. This requirement is particularly appropriate as this

class action moves into "stage two" where class members will be allowed to file individual claims with the court; it is essential that these class members feel that they can file their claims freely and openly, without retaliation or even the threat of retaliation. The interim plan adopted by this court must therefore assure both that the mayor promotes women without discriminating against them and that the women he promotes are promoted without retaliation, that is, without regard to whether they have supported or opposed the mayor in this lawsuit, or have filed, or intend to file, their own charges of sex discrimination against the department, or have engaged in any other similar protected conduct.

In summary, it will simply not be enough for the mayor to promote women or even to promote a sufficiently adequate number of women; in light of the mayor's past conduct, there must also be an effective but reasonable mechanism within the promotion system to bring to an end the mayor's persistent and defiant efforts at retaliation. The court will therefore limit the mayor's role in the interim promotion process as follows: The mayor must make his promotion selection from among the five highest-ranked candidates certified to him by the personnel board; but, if at any time the mayor chooses to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved are women, he must state in writing his reasons for rejecting the higher-ranked candidate. Plaintiff-intervenors will then be given 14 days in which to file a court challenge to the rejection, charging that the rejection is either sexually discriminatory or retaliatory. If no objection is made, the mayor may then select the lower-ranked candidate; otherwise, the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge.

## IV.

■ The parties agree, however, that any selection procedure adopted by the court may not have adverse impact upon blacks and women in job advancement. They agree that, if adverse impact occurs at any time, the personnel board must make only selective certifications to the mayor, consisting of only women or only blacks depending upon the circumstances. The parties disagree, however, on how adverse impact should be measured. The mayor and police chief, the personnel board, and the United States argue that adverse impact should be determined by reference to the "four-fifths rule" of the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D). Under the four-fifths rule, adverse impact exists when the selection rate for any race, sex, or ethnic group from any applicant pool is less than four-fifths of the rate for the group with the highest selection rate. The plaintiff-intervenors assert that this definition of adverse impact is not adequate in light of the court's prior findings of discrimination. They ask that the interim plan define adverse impact by reference to "equal selection rates," whereby adverse impact exists whenever a certain race, sex, or ethnic group's percentage of those selected is less than its percentage in the applicant pool.

The court believes that measurement of adverse impact by the four-fifths rule is adequate. The four-fifths rule is now being used as a measurement of adverse impact against black police officers in *United States v. City of Montgomery*, with satisfactory results. As the interim promotion system adopted here, in this sex discrimination case, will also operate for promotions in the race discrimination case, the court believes that the measurement of adverse impact should be the same in both cases, if at all reasonably possible.

## V.

■ The parties also disagree on whether the interim plan should include the creation of the position of an equal employment opportunity (EEO) officer. The plaintiff-intervenors argue that an EEO officer is not only appropriate, but necessary. The mayor and police chief and the personnel board oppose the position, arguing that the position is inappropriate in a temporary

scheme. The court agrees with the plaintiff-intervenors.

The court is convinced that the atmosphere of sex discrimination and retaliation in the police department continues to be so suffocatingly deep and pervasive that it is substantially impeding the ability of female police officers to advance in the department. The court is also concerned that this atmosphere will deter class members from exercising their right to come forward with their own individual claims of discrimination as this case moves into stage two. This atmosphere results not only from blatant and direct acts of discrimination and retaliation, but it is also due to more indirect and subtle conditions of discrimination and retaliation within the department. For example, recent evidence revealed that the police chief now has on display on one of the walls in his office, for all who visit him to see, a framed newspaper advertisement listing the names of all female officers who supported the mayor in his opposition to this lawsuit. The message to all in the department who see the display or who hear about the display, is clear: that these female police officers whose names are listed in the advertisement are the "loyal favored," at least among the women in the department and, correlatively, that those female officers whose names are not listed are not among the favored.

Admittedly, it could be argued that many of the circumstances giving rise to this atmosphere result not from any conscious effort to discriminate or retaliate on the part of the mayor and police chief, but more from an insensitivity on their part to the plight of those women in the department who believe they have been—and, in fact, may have been—the victims of sex discrimination and retaliation in the department. But whatever the source of this atmosphere, its continued presence is intolerable and must be redressed immediately. The orders already issued by the court have so far not adequately redressed this condition; and, so far, the mayor and the police chief have not acted in good faith to establish a department in which all men and women, irrespective of their connection or lack of connection with this lawsuit, can

feel certain that they will be treated fairly by the department. And yet, the plaintiff-intervenors have not suggested that the court take the drastic measure of removing the department from the control of the mayor and police chief. Rather, the plaintiff-intervenors have suggested a much less drastic and intrusive remedy, that is, the creation of an EEO officer for the department. The EEO officer would assist the mayor and police chief in ridding the department of not only all open and concrete forms of discrimination and retaliation, but all subtle and indirect forms as well.

Moreover, in its November 17 opinion and order, the court found the police department's policy and practice regarding transfers, training and education, and career counseling were sexually discriminatory. The interim plan does not directly address these important matters, and thus the plaintiff class is left without immediate relief as to them. The EEO officer could, however, begin to address these matters immediately, without a court directive.

To be effective, the EEO officer must be able to work closely and comfortably with the mayor and the police chief, but yet must in no manner be under their control. The court will therefore require that the personnel board, with the consent of the plaintiff-intervenors, appoint the EEO officer; the board, with the assistance of the plaintiff-intervenors, will also define and set the duties and responsibilities of the officer, in light of the concerns expressed by the court here. The board may make the EEO officer a part-time or full-time position, depending on the demands of the job as determined by the board. The board will also have the authority to discharge, for good cause shown, any one it appoints as EEO officer.

The court understands that under state law the personnel board is not under the direct control of the mayor and the police chief. The court intends and expects that neither the mayor, the chief of police, nor anyone else connected with the police department shall have any role, direct or indirect, in the selection of the EEO officer.

The officer will, however, be considered an employee of the City of Montgomery, with the city responsible for the officer's salary and any other benefits city employees receive. The parties will be allowed to agree upon the EEO officer's salary and other benefits; but, if they cannot agree, the court will set them.

### VI.

■ The plaintiff-intervenors request that their counsel and experts be allowed access to all evaluations, interview ratings, and other source documents upon which rankings are based. The personnel board opposes these requests because it believes that the confidential nature of such information will be destroyed if such practice is instituted.

Counsel and experts for plaintiffs-intervenors and the United States must have full access to all documents upon which rankings are made if they are to monitor adequately the interim promotion system. However, to allay the personnel board's concerns about confidentiality, the court will prohibit counsel and experts for the plaintiff-intervenors and the United States from revealing these documents, either directly or indirectly, to anyone else, including the plaintiff-intervenors; however, of course, such documents may always be used in connection with any proceeding in this court.

### VII.

Finally, the court recognizes that it has not only the authority but the duty to fashion relief for the plaintiff-intervenors and their class that will as far as possible eliminate all discriminatory and retaliatory effects of the past as well as bar like acts in the future. *See United States v. Paradise*, —— U.S. ——, ——, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (Brennan, J., plurality opinion). The court further recognizes that the promotion scheme it adopts today falls far short of meeting this responsibility. The court has nonetheless adopted the plan, but on an interim basis only, for two reasons: first, as already stated, the department needs a promotion system immediately, and thus the department cannot wait the year or more it will take to develop a permanent system that fully and adequately redresses the department's entrenched practice and policy of sex discrimination and retaliation; and, second, while the plan does not cure all the wrongs in the department as found by the court, it does attempt to redress many of the most substantial and intolerable ones. This interim plan is therefore an emergency stop-gap measure only, designed merely to provide some substantial degree of relief until a permanent plan providing full relief can be developed and implemented.

It is, accordingly, the ORDER, JUDGMENT, and DECREE of the court that the parties are ENJOINED to implement the attached interim promotion system.

## INTERIM PROMOTION PLAN FOR THE POLICE DEPARTMENT OF THE CITY OF MONTGOMERY, ALABAMA

### I. ELIGIBILITY FOR PROMOTIONS

One must have at least one year's tenure in the next lower position to be eligible for a promotion to the next higher position within the City of Montgomery Police Department.

### II. RANKING PROCEDURE

A. Police department performance evaluations shall be performed on a periodic basis.

1. Experts for the plaintiff-intervenors, the City of Montgomery, and the United States may review the evaluation system and suggest changes in an effort to make the performance evaluations as objective as possible, bearing in mind that an interim promotion system should be implemented as soon as possible.

2. All performance evaluations shall be confidential, in the sense that the only people or entities who may see the evaluations, or have access to them, will be the particular evaluator and the personnel board, except as otherwise noted herein. The evaluator will rate only those persons under his or her

command and will be equal to or one rank above that sought by the candidate. Each candidate shall have the opportunity to review his or her performance evaluation and state any objections that the candidate may have to same.

3. Each candidate's performance evaluations shall count fifty percent of the candidate's total score for ranking purposes.

B. Oral interviews.

1. A panel of three members shall be appointed to conduct oral interviews.

(a) The plaintiff-intervenors shall have one appointment to the panel.

(b) The City of Montgomery shall have one appointment to the panel.

(c) The Montgomery City-County Personnel Board shall have one appointment to the panel.

(d) The court may remove any member from the panel for good cause shown.

2. None of the appointments to the panel shall be people who are employed by the City of Montgomery.

3. At least one woman and at least one black person shall be on the panel.

4. The panel shall be paid by the City of Montgomery at a uniform rate for the time actually served. The parties are to attempt to agree upon a reasonable rate of pay; but if they cannot the court will then set the rate.

5. Panel members must be appointed from among Alabama residents and, if possible, from among Montgomery residents.

6. The panel shall conduct oral interviews of all candidates for promotion to any position.

7. Experts for the plaintiff-intervenors, the defendants, and the United States shall have the opportunity for input into the oral interview process, in an effort to make the oral interviews as objective as possible.

8. Each candidate for promotion shall be rated on the oral interview by each panel member, and the scores for each candidate shall be averaged.

C. The personnel board shall average each candidate's scores from the interviews and the performance evaluations on a fifty-fifty basis and the board shall then rank each candidate on the basis of his or her combined average score.

III. SELECTION

A. The promotions to each position shall not have adverse impact on female or black candidates, measured over a period of one year beginning with the date that the interim promotion process becomes effective.

B. Based on the ranking procedure outlined above, the personnel board shall compile a register of eligible candidates for each promotional position, with all candidates listed in order of their rankings.

C. When a vacancy occurs in a promotional position, the name of the five highest ranked candidates on the list for that position shall be certified to the mayor, with their relative ranks indicated on the certification. (If there are two vacancies to be filled simultaneously within one position, the six highest ranking names shall be submitted to the mayor; for three vacancies, the seven highest ranking names shall be submitted, and so forth.) If the mayor passes over a higher-ranked candidate for a lower-ranked candidate, he must state his reasons for doing so in writing. Plaintiff-intervenors' counsel shall have 14 days to file a challenge to the rejection in court, charging that the rejection is sexually discriminatory or retaliatory. If no court challenge is made, the mayor may select the lower-ranked candidate; otherwise, the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge. A person may be removed from the certified list only for reasons which presently are permissible, such as refusing the position, having moved out of Montgomery, etc. When a person is

removed from the certified list of top ranked candidates, the next highest ranked person shall be certified to the mayor.

D. If the foregoing procedure does not avoid adverse impact, selective certifications shall be made to the mayor. That is, a certification of the five highest ranked females or blacks shall be given to the mayor if it is necessary to promote a female or black to avoid adverse impact.

## IV. DISCLOSURE OF INFORMATION

1. The personnel board shall provide plaintiff-intervenors' counsel with a list of the names of all persons who apply for promotions under the interim system, their race, their sex, the position applied for, their ranking on the eligibility list, whether or not they were promoted, and the date the promotions took place. Further, counsel and experts for plaintiffs and the United States shall have access, for the purpose of inspection and/or copying, to source documents from which a numerical score is derived for candidates for any given position, and to all other documents utilized by the personnel board relating to a given promotion.

2. All information furnished to the plaintiff-intervenors' and the United States' counsel and experts by the personnel board is furnished for the exclusive use of said counsel and experts for the purpose of compliance review and is confidential; provided that such information may be used as evidence in a proceeding to enforce the terms of the relevant court orders.

## V. TRANSFERS AND APPLICATIONS FOR TRAINING AND/OR EDUCATIONAL OPPORTUNITIES

Experts for the plaintiff-intervenors, the City of Montgomery, and the United States shall have the opportunity for input into an interim plan for handling transfers and applications for training and/or educational opportunities.

## VI. EEO OFFICER

The personnel board and the City of Montgomery shall establish the position of equal employment opportunity (EEO) officer within the police department. The personnel board, with the consent of the plaintiff-intervenors, shall appoint the EEO officer; the board, with the assistance of the plaintiff-intervenors, shall define and set the duties and responsibilities of the officer; and the board shall have the authority to discharge any person from the position of EEO officer for good cause shown. The board may make the EEO officer position either part-time or full-time, depending on the demands of the job as determined by the board.

The EEO officer shall be an employee of the City of Montgomery, with the city responsible for the officer's salary and any other benefits city employees receive. The parties shall attempt to agree on the officer's salary and other benefits; but, if they cannot agree, the court will set the officer's salary and other benefits.

The position of EEO officer shall terminate with the termination of this interim promotion plan, unless the position is extended by the permanent plan.

## VII. EXPIRATION PERIOD

This interim system shall expire within 12 months of the date that it is implemented or earlier upon order of this court. 60 days prior to the end of the 12 month period, the parties and the United States shall make a status report on the development of a permanent system.