Carolyn JORDAN, etc., et al., Plaintiffs,

Sandra M. Pierce–Hanna, et al., Plaintiff–Intervenors,

v.

John WILSON, etc., et al., Defendants,

Gordon M. Ledbetter and John D. Shumway, Defendant–Intervenors.

Civil Action No. 75–19–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 20, 1996.

Order Dismissing Action March 7, 1997.

J. Richard Cohen, Southern Poverty Law Center, Montgomery, AL.·

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, for all defendants except Wade L. Moss and Montgomery City–County Personnel Bd.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, AL, for Wade L. Moss and Montgomery City–County Personnel Bd.

M. Wayne Sabel, Argo, Enslen, Holloway & Sabel, Montgomery, AL, for Pierce & Oyler.

Thomas M. Goggans, Montgomery, AL, for white male police officers of the City of Montgomery and Ledbetter intervenors.

Thomas Tankersley, Montgomery, AL, for City of Montgomery.

Howard Mandell, Montgomery, AL, for plaintiff intervenor Roger Owens.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In this 21–year–old lawsuit, female officers in the Police Department of the City of Montgomery, Alabama, claimed that they were victims of a pattern and practice of gender discrimination. This lawsuit is now before the court on the defendants' motion to dismiss. Plaintiff-intervenor Sandra M. Pierce–Hanna, who represents a class composed of all past, present and future female officers in the department with regard to all employment practices except hiring, opposes the motion. Based on the record, including the evidence presented at a hearing held on November 27, 1996, the court agrees with the defendants that it is now time to bring this litigation to an end.

## I. BACKGROUND

A general overview is necessary for proper resolution of the defendants' motion to dismiss. As is evident, this litigation is long-standing, and thus it has a long history. Fortunately, much of this history is documented in reported cases.

### A. The 1976 Order

This lawsuit was originally brought in 1975 by Carolyn Jordan. Jordan named as defendants various officials of the City of Montgomery and its Police Department, charging them with gender discrimination in hiring. In 1976, in response to the original filing, this court found that officials of the city and its Police Department had failed "to employ females on the same basis as males,"[1] and the court ordered city and police officials to hire, assign, promote, and compensate all female police officers on an equal basis with male officers.[2] The court, in an 1976 order, broadly enjoined city and police officials "[f]rom engaging in any act or practice which has the purpose or effect of discriminating against any employee, any applicant, or any potential applicant for employment with the Montgomery Police Department because of the individual's sex."[3]

### B. United States v. City of Montgomery

In September 1978, Sidney Williams, an African–American city police officer, intervened in another lawsuit, United States v. City of Montgomery, civil action no. 3739–N (M.D.Ala.), claiming, among other things,

---

1. Memorandum Opinion of March 12, 1976, at 4.

2. Order of March 12, 1976.

3. Id.

that the Police Department had denied him a promotion to sergeant in retaliation for contacting the United States Department of Justice and because of racially-discriminatory employment procedures. The United States had brought the lawsuit in 1972, charging the City of Montgomery with race discrimination against African–Americans in all city departments. In 1979, the court held that the written examination for promotion to police sergeant had an impermissible "disparate impact" on black officers in violation of Title VII.[4] The court enjoined the defendants from future use of the test, or any other test or procedure with disparate racial impact, unless and until the test or procedure has been validated in accordance with federal law; the court, however, denied Williams any individual relief. A year later, the court dismissed Williams as a named party.[5]

### C. The 1986 Order

Four years later, in 1983, Pierce–Hanna intervened in the instant lawsuit to pursue further the claims brought by Jordan. On January 3, 1985, the court certified this phase of the lawsuit as a class action with Pierce–Hanna as a representative of a class of "all past, present, and future female police officers of the Montgomery Police Department, with regard to all employment practices except hiring."[6] Pierce–Hanna rested her complaint of gender discrimination on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983.

In a memorandum opinion and order issued on November 17, 1986, the court held that the Police Department's promotion procedures had an impermissible "adverse impact" on women and that the department had systematically and intentionally discrimi-nated against female officers in promotions, in violation of Title VII and the equal protection clause.[7] The court found that "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department."[8] The court allowed the parties an opportunity to attempt to resolve the issue of what individual remedial relief should be awarded to Pierce–Hanna and the members of the class she represented.[9] The court also ordered the department to develop new promotion procedures.[10]

The court also found that the Mayor of Montgomery had "concocted a department-wide scheme to discredit and embarrass ... Pierce[-Hanna] for having initiated the charges."[11] As later capsulized by the court, the evidence relied upon in reaching this finding was as follows:

"Receiving their cue from the mayor, Pierce[-Hanna]'s supervisors suddenly began to give her extremely poor ratings, with the result that her ranking on the promotion register dropped precipitously and dramatically. The scheme was thus not subtle and hidden, but open, obvious and widespread so that everyone in the department could see that the penalty for 'disloyalty' was very great. It was based on open intimidation and had a two-fold purpose: first, to punish Pierce-[Hanna] and force her out of the department; and second, to force others in the department to join the mayor in his vendetta against Pierce[-Hanna] and in his opposition to her lawsuit.

"The scheme, however, also had an element of reward to it. On one occasion the mayor rewarded two female officers for supporting him against Pierce[-Hanna],

---

4. Order of April 30, 1979.

5. Order of April 2, 1980.

6. *Jordan v. Swindall*, 105 F.R.D. 45, 46 (M.D.Ala. 1985).

7. *Jordan v. Wilson*, 649 F.Supp. 1038 (M.D.Ala. 1986).

8. *Id.* at 1058.

9. *Id.* at 1063.

10. *Id.*

11. *Jordan v. Wilson*, 667 F.Supp. 772, 776 (M.D.Ala.1987).

by promoting them while rejecting Pierce[-Hanna]." [12]

Because "there [was] a strong probability of further retaliation" and because an injunction banning retaliation was not already outstanding, the court issued an order prohibiting the Mayor and all police officials from retaliating against persons in the department and, in particular, from retaliating against Pierce–Hanna.[13]

In May 1987, because the parties were unable to agree on new procedures, the court fashioned and ordered implemented an interim promotion plan for the Police Department.[14] The relief applied to the instant case and to the companion case of *United States v. City of Montgomery*.[15] The interim plan required, among other things, that promotions were to have no adverse impact on either African–American or female candidates, measured in accordance with the "four-fifths rule" of the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D).[16] In addition, under the plan, the mayor had to make his promotion selection from among the five highest-ranked candidates, and if the mayor chose to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved were black or women, he had to state in writing his reasons for rejecting the higher-ranked candidate. Pierce–Hanna, on behalf of herself and other female officers, was then given a period of time to challenge the rejection as sexually discriminatory or retaliatory. If an objection was made, the mayor could not select the lower-ranked candidate unless and until the court ruled in the mayor's favor on the challenge.[17] The interim plan was intended to last only twelve months.[18]

In March 1988, Pierce–Hanna and the defendants were able to reach agreement as to all individual claims. The agreement was embodied in a consent decree.[19]

In the meantime, in January 1988, the court appointed counsel for all African–American officers in the Police Department and invited the officers to come forth with one or more named representatives to intervene in the companion case of *United States v. City of Montgomery* and to represent and pursue the interests of the officers as a class.[20] In addition, in response to a request from the defendants, the court invited all white male police officers to participate in both the instant case and the companion case of *United States v. City of Montgomery*, and the court appointed counsel to represent them.[21] In March 1988, Sidney Williams, Edward McCurdy, Frank L. Brown, and William Dunn were allowed to intervene in *United States v. City of Montgomery* to pursue claims of race discrimination on behalf of African–Americans, and that same month Gordon M. Ledbetter and John M. Shumway were allowed to intervene on behalf of white males in both the instant case and *United States v. City of Montgomery*.[22] Finally, in 1988, the court certified two classes: the "Williams intervenors" in *United States v. City of Montgomery* to represent all present and future black police officers in the Police Department, with the class represented by plaintiff-intervenors Williams, McCurdy, Brown, and Dunn; and the "Ledbetter intervenors" in the instant case and *United States v. City of Montgomery* to represent all present and future white male police officers in the Police Department, with the class represented by defendant-intervenors Ledbetter and Shumway.[23]

In May 1989, in response to a motion for declaratory relief filed by the City of Mont-

**12.** *Id.* (citation omitted).

**13.** *Jordan v. Wilson*, 649 F.Supp. at 1064.

**14.** *Jordan v. Wilson*, 667 F.Supp. 772 (M.D.Ala. 1987).

**15.** *Id.* at 774.

**16.** *Id.* at 777.

**17.** *Id.*

**18.** *Id.* at 781.

**19.** Order of March 17, 1988.

**20.** *Sims v. Montgomery County Commission*, 686 F.Supp. 878 (M.D.Ala.1988).

**21.** Order of February 9, 1988.

**22.** Orders of March 1 and 16, 1988.

**23.** Order of April 4, 1988.

gomery, the court held that a proposed promotion of an African–American police officer to the rank of lieutenant was in conformity with the court-ordered interim promotion plan,[24] and the Eleventh Circuit affirmed the holding.[25] In addition, in April 1990, in response to a motion filed by Pierce–Hanna, the court held that the promotion of six males and no females to captain during the period of enforcement of the interim plan violated plan provisions prohibiting adverse impact on female officers.[26] The court required the defendants to promote a female police officer to the rank of captain within 21 days.[27]

In 1989, the litigation in the instant case and in *United States v. City of Montgomery* resumed in full bloom. That year, one of the Police Department's deputy chiefs announced that he intended to retire. Then, the department had two deputy chiefs: one supervised the "operations" side and the other the "staff" side of the department. In general, the operations side of the department covered direct law-enforcement procedures and included the patrol and investigative divisions, while the staff side was more administrative in character. Below the deputy chiefs were the majors, who each commanded a division within the police department. Each major reported directly to one of the deputy chiefs. The retiring deputy chief supervised the "staff" side of the department. The Chief of Police appointed Roger Owens, a white male, as "deputy-chief designate," to assume the new position when the retiring deputy chief left on September 29, 1989.

In June 1989, in response to challenges made by two female officers (including Pierce–Hanna) and two black officers to the appointment, the court preliminarily found that the Police Chief had appointed Owens, and had refused to consider and select any of these four other police officers, in retaliation

for the four officers' prior participation in this litigation.[28] The court entered a preliminary injunction requiring that the Mayor and the Police Chief develop an interim selection plan that would allow all eligible officers, including Owens, to compete for the deputy chief position without regard to a candidate's sex, race, or connection with this litigation. The court vacated the appointment of Owens pending court resolution of the challenges to the appointment. Owens was allowed to continue in the position on an acting basis, however.

In August 1989, the court entered a memorandum opinion and injunction making final its earlier preliminary finding of retaliation against the complaining two female and two black officers. The court concluded that the Police Chief "intended to choose only someone for deputy chief who had not in the past participated in lawsuits challenging the employment practices of the police department." [29] In support of this conclusion, the court noted that the Police Chief continued to prominently and officially signal his feelings about Pierce–Hanna by displaying to the public on the walls of his office a framed copy of a public letter signed by female officers opposing the prosecution of Pierce–Hanna's initial sex discrimination lawsuit against the department. The court observed that,

"The message to all in the department who see the display or who hear about the display, is clear: that these female police officers whose names are listed in the advertisement are the 'loyal favored,' at least among the women in the department and, correlatively, that those female officers whose names are not listed are not among the favored." [30]

Indeed, the evidence from earlier proceedings reflected that one of the department's deputy chiefs stated matter-of-factly at a

---

**24.** *United States v. City of Montgomery,* 731 F.Supp. 436 (M.D.Ala.1989).

**25.** *United States v. City of Montgomery,* 900 F.2d 265 (11th Cir.1990) (table).

**26.** *United States v. City of Montgomery,* 744 F.Supp. 1089 (M.D.Ala.1990).

**27.** *Id.* at 1091.

**28.** Orders of June 21, 1989 in both *City of Montgomery,* civil action no. 3739–N, and *Jordan,* civil action no. 75–19–N.

**29.** *United States v. City of Montgomery,* 744 F.Supp. 1074, 1080–81 (M.D.Ala.1989).

**30.** *Id.* at 1082.

staff meeting that a certain female officer would never be promoted because she had failed to sign this letter. The deputy chief later testified that it was the common feeling of members of the department that anyone who did not sign the letter would be viewed as "throwing stones," and as "not being in your corner." This same deputy chief also threatened a female officer just before she was to give testimony in suits against the department, accusing her of having "jumped ship" and of being "no longer loyal to the police department or the administration." [31] The deputy chief warned her that she and her division would no longer enjoy the "favorable treatment" they had received in the past.[32] Moreover, when the Chief of Police learned of the threat, he took no action against the deputy chief. And in a similar vein, the Mayor has expressed deep disappointment with this female officer's testimony in the instant case and in the companion case of *United States v. City of Montgomery*. He stated that she "led the charge for me against the sex discrimination [lawsuit]," but that, in light of her recent testimony in these cases, he no longer viewed her as loyal.[33]

The court continued its injunction against the appointment of Owens and continued its requirement that the Mayor and the Police Chief develop an interim plan for selection of deputy chief.[34] The court noted that the four complaining officers "commendably" did not seek to have the court "appoint one of [them] as the new deputy chief," even though they were entitled to such relief.[35] The court explained that, "Rather than asking the court to decide who should be named deputy chief ..., the [four officers] seek more systemic relief: they want an open, fair process in

which all majors, including Owens, can compete for the deputy chief position based upon new, more objective criteria." [36] The relief proposed by the complaining officers, the court continued, "will allow members of the department to compete for the deputy chief position without regard to race, sex or connection with these lawsuits." [37] The defendants appealed, and the Eleventh Circuit Court of Appeals affirmed the court's final injunction.[38]

In early 1990, in response to another challenge filed by Pierce–Hanna on behalf of a fellow officer, Tommi Lee Alford, the court held that the Police Chief had refused to promote Alford to the rank of captain "because of her prominent role in this litigation." [39] The court required the defendants to promote Alford.[40] The Eleventh Circuit affirmed.[41]

In August 1990, after the Eleventh Circuit had affirmed the final order requiring that the defendants establish new procedures for selecting a new deputy chief,[42] this court approved and adopted an interim selection plan for deputy chief.[43] The plan was substantially parallel to the court-ordered interim-promotion plan previously adopted for ranks below that of deputy chief, with the exception that its reach was expanded to allow black officers, as well as female officers, to seek immediate court relief should the defendants discriminate or retaliate against them. Paragraph 7 of the deputy-chief plan provided that, "If the mayor passes over a higher-ranked candidate for a lower-ranked candidate, he has to state his reasons for doing so in writing." The female

---

31. *Id.* at 1082.

32. *Id.*

33. *Id.*

34. *Id.* at 1088.

35. *Id.* at 1087.

36. *Id.*

37. *Id.*

38. *United States v. City of Montgomery*, 911 F.2d 741 (11th Cir.1990) (table).

39. *United States v. City of Montgomery*, 755 F.Supp. 1522, 1531 (M.D.Ala.1990).

40. *Id.*

41. *United States v. City of Montgomery*, 934 F.2d 1265 (11th Cir.1991) (table).

42. *United States v. City of Montgomery*, 934 F.2d 1265 (11th Cir.1991) (table).

43. Order of August 3, 1990.

police officers and the black police officers were then given a period of time to challenge the rejection as either sexually or racially discriminatory or retaliatory. Paragraph 7 further provided that, if there was a challenge to a selection, the Mayor could not select the lower-ranked candidate unless and until the court ruled in the Mayor's favor on the challenge.

More recently, in July 1991, in response to another claim filed by Pierce–Hanna on behalf of other members of the female class, the court held that the defendants had, in bad faith, refused to comply with two aspects of the March 1988 consent decree resolving female class members' individual claims.[44] First, the decree required the defendants to promote one female to lieutenant and another female to captain in 1990.[45] The defendants argued that, although the consent decree required that they make the promotions, they had no obligations to do so because no plan for promotions had been developed and the consent decree did not expressly require that they develop a plan. The court rejected the defendants' argument as "frivolous and disingenuous."[46] The court wrote that "It . . . logically and obviously follows that, if a plan had to be developed to make the promotions, it was the defendants' responsibility to do so."[47]

Second, the 1988 consent decree required that the defendants promote two other named female officers to the rank of sergeant in 1990. The defendants argued that they had not promoted the two officers because of their substandard performance.[48] In rejecting the defendants' argument, the court relied on an earlier opinion in which the court had specifically instructed the defendants as to when and under what circumstances they might decline to promote an officer in the face of an order or consent decree that re-

quired that they do so. The court wrote that it had previously instructed the defendants that "In the future . . . the defendants must seek formal court approval before taking any action which conflicts with any of the orders of the court."[49] In "flagrant disregard of this language and of their obligation under the 1988 consent decree," the court continued, "the defendants refused to promote [the two officers] in 1990 without obtaining prior approval of the court."[50] "The defendants have not attempted to justify, or even explain, their actions," the court stated, but rather they "have approached this litigation as if the above cautionary instructions by the court did not exist."[51] The court characterized "the defendants' actions toward the required 1990 promotions [as being] part of a pattern of conscious disregard and violation of the orders of this court."[52]

In the spring of 1991, after almost another year without activity, Pierce–Hanna complained to the court on behalf of the class of female officers that the Mayor and the Police Chief were intentionally delaying implementation of the deputy-chief interim-selection plan in order to keep Owens as acting deputy chief. In July 1991, the court entered an order requiring that the Mayor and the Police Chief complete forthwith the ranking of the candidates for the position of deputy chief. The Mayor and the Police Chief requested, and the court approved, a plan authorizing the Police Department to have the rankings done under the auspices of an outside assessment group.

In early August 1991, the outside assessment group completed its rankings, which, according to the group, the Police Department could reliably use to conclude that a candidate who ranked higher than another was, in fact, overall more qualified under the criteria used by the group. Pierce–Hanna

44. *United States v. City of Montgomery*, 770 F.Supp. 1523 (M.D.Ala.1991).

45. Order of March 17, 1988.

46. *United States v. City of Montgomery*, 770 F.Supp. at 1526.

47. *Id.*

48. *Id.* at 1527.

49. *Id.* at 1528 (emphasis omitted) (quoting *Jordan v. Wilson*, 755 F.Supp. 993, 1001 n. 13 (M.D.Ala.1990)).

50. *Id.* at 1528.

51. *Id.*

52. *Id.*

ranked first and Owens ranked second. The Police Chief, however, passed over Pierce–Hanna and recommended that Owens receive the appointment. The Mayor approved the recommendation. The Mayor and the Police Chief then had the city pay Owens $7,000 in backpay, that is, the additional amount he would have received had he assumed the position on an permanent basis on September 29, 1989. They did this even though ¶ 7 of the selection plan expressly provided that "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge" and even though the Montgomery City–County Personnel Board had refused to confirm the reappointment because the board believed the reappointment violated ¶ 7.

As was to be expected, Pierce–Hanna quickly responded to the reappointment by filing a challenge, charging that the Mayor and the Police Chief had passed over her and selected Owens because of her gender and because of her participation in this litigation. On October 3, 1991, the court entered an order requiring that the defendants vacate Owens's appointment pursuant to ¶ 7 of the interim selection plan.[53] The court found the defendants' argument—that the selection plan did not apply to the reappointment—to be "disingenuous."[54] After noting that even the Montgomery City–County Personnel Board had refused to process Owens's reappointment because it obviously violated the selection plan, the court reaffirmed the need for the plan: The "evidence before the court reflected that [the Mayor and the Police Chief] had engaged in a continuous pattern of discrimination and retaliation against female officers, against those who participated in this litigation, and, in particular, against Pierce–Hanna, all in violation of court orders."[55] In March 1992, the court issued a memorandum opinion and final judgment, holding that the evidence was overwhelming that Pierce–Hanna had been denied the posi-

tion of deputy chief in retaliation for her participation in this litigation.[56] The court observed that,

"Pierce-Hanna could have had the deputy-chief position three years ago. If she had asked the court to choose from among the four complaining officers who prevailed in the first round, the court would have chosen her because she was unquestionably the most qualified. Yet with a display of remarkable strength and forbearance, she chose to use this litigation not for herself but rather for the benefit of all majors and thus the department itself. Assuredly, she also wanted to prove to doubters that, under any test the police department could construct, she would still come out on top. She therefore agreed to the creation of a new, open, and fair process in which all majors, including Owens, could compete. As she believed would happen, the scorers under the new process ranked her number one. Nevertheless, she has had to turn once again to this court to seek redress because the defendants have once again illegally denied her the deputy-chief position in retaliation for her litigation. It is now time she receive the prize she has won not once but twice." [57]

The court required that the Mayor and the Police Chief appoint Pierce–Hanna as the new permanent deputy chief.[58] Later, in April 1992, the interim plan for selection of a deputy chief was made permanent.[59]

### D. *The Sergeant's Examination*

In late 1989, the City of Montgomery submitted to the court a proposed new permanent plan for promotions to the rank of sergeant in the Police Department. The plan included both a written scored test and a structured oral interview to assess or measure a candidate's attributes. Based on the combined scores on the written test and oral interview, the candidates were then grouped

53. Order of October 3, 1991.

54. *Id.* at 10.

55. *Id.* at 11.

56. *United States v. City of Montgomery,* 788 F.Supp. 1563 (M.D.Ala.1992).

57. *Id.* at 1581–82.

58. *Id.*

59. Order of April 21, 1992.

within "bands" to guard against over interpreting small differences and to reflect that the selection procedures—like all selection procedures—did not measure everything. Candidates within each band were considered equally qualified. Under this banding approach, each band was to be exhausted in turn, beginning with the band containing the highest scores.

Over objections from the Williams intervenors and the Ledbetter intervenors and despite the fact that the sergeant selection procedures had a racially disparate impact on African–American candidates,[60] the court found the written test and oral interview aspects of the procedures were "valid" under Title VII and thus could be used by the Police Department.[61]

The Ledbetter intervenors and the United States also complained that the Police Department had no formalized procedure for making selections from within bands. The lack of formalized procedures, according to them, invited arbitrariness. The Police Department responded that it had asked its testing expert to develop a training program to help guide the department in making selections from within bands. The training was to be designed to help the department avoid common rating biases and to focus its attention on those abilities important for sergeants but not capable of being measured by the written test and the oral interview. Furthermore, because these additional guidelines developed for the department would necessarily be subjective ones that would be difficult if not impossible to validate, the department agreed to avoid adverse impact for selections from within bands.[62] The court held, for two reasons, that the "issue of within-band selections [was] not ripe for resolution."[63] First, the evidence reflected that, "Given that only white males remain in Band B, the only band from which further pro

motions are likely, it is unlikely that an issue about promotions from within the bands will arise in the context of this employment discrimination lawsuit."[64] And second, "Because the police department has yet to develop these additional guidelines, neither the parties nor the court can evaluate them."[65]

E. *Permanent Procedures for Promotions within the Police Department.*

In October 1992, the court approved the Montgomery City–County Personnel Board's proposal of permanent procedures for promotions within the Police Department.[66] The procedures provided methods for certification by the Personnel Board of candidates for promotion to particular ranks within the Police Department. The department would then select from among those candidates, and all parties would be informed of its choices, including the race and gender of the preferred candidates. The procedures did not cover appointments to positions as mayoral-aides. The parties would have seven days to lodge complaints with the court, and, if there were none, the board could implement the promotions. The promotion lists generated by these procedures were to be in place for only two years, after which new lists would be drawn up under the procedures.[67]

F. *Permanent Nondiscriminatory Policies and Procedures for Transfer and Internal Complaints within the Police Department*

In November 1992, the court issued a pair of orders. The first one approved the Police Department's proposed policies and procedures for dealing with internal complaints charging race or sex discrimination, and related complaints, such as retaliatory treatment.[68] The other approved a proposed assignment and transfer procedure developed by the Montgomery City–County Personnel Board, which was responsive to an order requiring them to "develop ... non-discrimi

---

**60.** *United States v. City of Montgomery,* 775 F.Supp. 1450, 1456 (M.D.Ala.1991).

**61.** *Id.* at 1456–59.

**62.** *Id.* at 1459.

**63.** *Id.*

**64.** *Id.*

**65.** *Id.*

**66.** Order of October 5, 1992.

**67.** *Id.*

**68.** Order of November 2, 1992.

natory policies and procedures regarding transfers, initial assignments, training and education, and career counseling." [69] Neither proposal had met with any objections from any other party.

G. *Permanent Nondiscriminatory Policies and Procedures regarding the Assignment of Police Officers as Mayoral Aides*

In February 1993, the court approved a permanent policy and procedure regarding the assignment of police officers as aides to the Mayor, this position having been excluded in the procedures adopted in the October 1992 order.[70] Under the policy, the Chief of Police would nominate qualified candidates for appointment without regard to race or gender, and the Mayor would select from among those nominees and assign them to specific details on the same nondiscriminatory basis. The program further allowed for monitoring of and challenges to appointment or to the procedure itself.

H. *Modifications of Transfer Procedures*

In May 1996, the defendants moved the court to modify the November 1992 order establishing the transfer policy within the Police Department. The only change was to permit employees to initiate transfer requests at any time after serving two years with the division or department from which they seek transfer. After no party objected in response to a show-cause order by the court, the modification was adopted in June 1996.[71]

I. *Years of Quietude*

Since 1992, the Montgomery Police Department has operated without any apparent evidence of gender discrimination. Indeed, one of the two deputy-chief positions was recently eliminated, and Pierce–Hanna's duties were expanded to include those of deputy chief for the entire department.

J. *The Defendants' Motion to Dismiss*

On August 2, 1996, in response to an oral request from the court, the defendants filed a motion for dissolution of all outstanding orders and dismissal of this litigation effective February 28, 1997. The court held a hearing on the motion on November 27, 1996.

## II.  DISCUSSION

■ Recently, this court stated that "It goes without saying that local autonomy of police departments is a 'vital national tradition.'" *United States v. City of Montgomery,* 948 F.Supp. 1553, 1563 (M.D.Ala.1996) (quoting *Freeman v. Pitts,* 503 U.S. 467, 490, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992)). "Returning governmental entities to the control of local authorities 'at the earliest practicable date is essential to restore their true accountability to our governmental system.'" *Id.* (quoting *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445). Therefore, "in addressing any statutory or constitutional violation by a police department or any other local governmental entity, a court's 'end purpose' must be to remedy the violation and then to restore authority to the local entity that is 'operating in compliance' with federal, state, and constitutional law." *Id.* (quoting *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445).

■ In making the determination of whether to terminate relief and restore full control to a governmental entity, a court should be informed by, at least, the following three considerations: "first, whether there has been full and satisfactory compliance with the court's outstanding orders; second, whether retention of judicial control is necessary or practical to achieve compliance with any outstanding orders; and third and finally, whether the governmental entity has demonstrated to the public and to those of the disfavored group its good-faith commitment to the whole of the court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *United States v. City of Montgomery,* 948 F.Supp. at 1563 (citing *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446 (articulating these factors in the context of a long-standing school desegregation case)). In considering these factors, a court should give particular attention to the governmental entity's "record of compliance."

---

**69.** Order of November 2, 1992.

**70.** Order of February 24, 1993.

**71.** Order of June 24, 1996.

*Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446. A local government is better positioned "to demonstrate its good-faith commitment" to a constitutional course of action when its policies exhibit a consistent pattern of lawful conduct directed at eliminating earlier violations. *Id.*

■ In the defendants' motion to dismiss, they ask that all outstanding orders in this litigation—for example, the October 1992 order (approving permanent promotion procedures in the department), the November 1992 and June 1996 orders (approving permanent policies and procedures for transfers, assignments, and internal complaints in the department), the April 1992 order (approving a permanent plan for the selection of deputy chief), and the February 1993 order (approving policies and procedures for assignment as mayoral aides)—remain in effect through only February 28, 1997. The defendants believe that all obligations under these orders can be fulfilled and their goals achieved by the end of February 1997. First, the defendants note that, under an order entered in October 1992, the city and the Montgomery City–County Personnel Board are required to follow certain steps in the development of selection procedures for promotional positions in the sworn ranks of the Montgomery Police Department. These procedures require that other parties, including the Williams intervenors and the Ledbetter intervenors, respond within certain time frames to information provided by the city and the Personnel Board. These procedures further limit to two years the life of the eligibility list for ranks of sergeant, lieutenant, captain, and major resulting from newly-developed selection procedures. The city's testing expert has developed and the city and Personnel Board have implemented a complete set of selection procedures covered by the October 1992 order, and a second such procedure for the rank of sergeant.[72] Currently, the city's testing expert is developing new procedures for lieutenant and captain. The city and Personnel Board anticipate that the new procedures for these two ranks will be implemented, with the initial selections

made in each rank based on the results of these procedures, by February 1997.

Second, the defendants state that certain persons remain concerned about the "banding" aspect of the Police Department's promotional procedures. Indeed, in the companion case, the United States has sought to formalize the process of making selections from within bands. *See United States v. City of Montgomery,* 775 F.Supp. 1450, 1456, 1459 (M.D.Ala.1991). At the hearing held on November 27, 1996, the defendants indicated that, with the help of their testing expert, they have now fashioned a process for selection from within bands. The process is as follows:

"When validated selection procedures utilize banding, the following is the process to be used in making selections from within bands.

Once the City/County Personnel Department has transmitted the list to the Montgomery Police Department (MPD), AUM or some other testing consultant, which may be the Personnel Department in the future, will assist MPD in selecting candidates from bands as follows.

"The consultant will provide the Chief of Police with a rating form listing those [knowledges, skills, and abilities, also known as] KSAs[,] not tapped by the formal procedures that the consultant deems appropriate for consideration in within-band selection ("untapped KSAs"). The rating form will contain instructions for its use and procedures for quantifying the Chief's judgments. The consultant will also provide separate lists of the KSAs tapped by the formal procedures and the untapped KSAs deemed appropriate for consideration.

"The Chief will request recommendations from the members of the Chief's staff on what candidate(s) is/are best suited to fill a vacancy or vacancies for a given rank. The Chief will instruct the staff members to consider the untapped KSAs and any unique requirements of a specific vacant

---

72. As stated, the job relatedness of the first promotional selection procedure developed for the rank of police sergeant was litigated prior to the

entry of the order of October 5, 1992. *United States v. City of Montgomery,* 775 F.Supp. 1450, 1456 (M.D.Ala.1991).

position or positions in making their recommendations. The staff members may consult personnel folders and other sources of information on candidates' job performance in making their recommendations.

"Once the staff members have made their recommendations to the Chief, the Chief will review the personnel folders of recommended candidates and any other candidates (in the band from which selections are being made) the Chief judges to be worthy of consideration for promotion. The Chief will complete the rating forms provided by the consultant and make his determination of which candidates are best suited for promotion. The Chief's determination will be based upon the scores the Chief assigns to the rating forms. The Chief will then forward the final list of promotees to the appointing authority, the Mayor, for his approval and action.

"In order to assist the staff members in their deliberations, AUM will meet with the Chief's staff members on 2 December 1996 and conduct a training session on selection from within bands. The content of the training session will address the following: 1) the formal promotion procedures and what they measured, 2) the KSAs deemed appropriate for consideration for within-band selection, 3) the need to avoid using KSAs tapped by the formal procedures in selecting candidates from within bands, 4) the need to focus on untapped KSAs in selecting candidates from within bands, and 5) the desirability of considering position-specific requirements in selecting candidates from within bands." [73]

Third and finally, the defendants note that, in June 1996, the court allowed the city to modify its transfer and assignment policy for sworn positions within the Montgomery Police Department. The parties, according to defendants, have agreed to attempt to resolve among themselves other similar modification requests that might arise before the termination of this lawsuit so that only those matters on which the parties cannot first reach agreement would be presented to the court.

Relying on the above observations and evidence presented by the parties, the court agrees with the defendants that it appears that they will be able to achieve full compliance with all outstanding court orders by the end of February 1997. If the defendants live up to this representation, the first factor—whether there has been full and satisfactory compliance with the court's outstanding orders—will be satisfied. The second and third factors—whether retention of judicial control is necessary or practical to achieve compliance with outstanding orders, and whether the governmental entity has demonstrated to the public and to those of the disfavored group its good-faith commitment to these orders—will be satisfied as well. At the hearing on November 27, 1996, the defendants put forward *affirmative* evidence that, by February 28, 1997, they will have met their obligations under all outstanding orders of the court. They first presented testimony from their testing expert. But the principal evidence came from the principal complainant in this litigation, Pierce–Hanna. Pierce–Hanna acknowledged that, over the last four years, the Montgomery Police Department has demonstrated its good-faith commitment to eliminating earlier violations and to a course of action fully consistent with lawful conduct.

■ Admittedly, Pierce–Hanna also testified that she is concerned that the recent years of success and quietude in this litigation may be due to the overhanging presence of this court in the operations of the Montgomery Police Department, and that, for this reason, she objects to the termination of this litigation at this time. To be sure, the Police Department will probably be the object of future lawsuits charging gender discrimination, and some of these lawsuits may even be found to have merit. But this court does not sit to *prevent* all future wrongdoing; a police department, like all governmental entities, is made up of humans, and the department simply cannot assure that its employees will never do wrong, that they will never engage in gender discrimination in the future. In-

73. Defendants' submission filed on December 2, 1996.

deed, even under the continued eye of the court, there can be no absolute assurance that a supervisor or a co-worker will not engage in gender discrimination. What the department can do, and has done here, is to take reasonable steps to decrease the likelihood of such discriminatory conduct in the future. Thus, the mere fact that there may be impermissible discrimination in the future does not, by itself, warrant the continued assumption of court control over a governmental entity for past misconduct.

But more specific to this litigation, the court believes that, in maintaining her objection to the cessation of court supervision, Pierce–Hanna greatly shortchanges herself and greatly overlooks the critical and beneficial role she has personally played in this litigation. In matters of personnel, a court mainly reacts, that is, it reacts to complaints brought by others. In the end, the success of personnel policies rests on those who enforce them and who are subject to them. Throughout this litigation, Pierce–Hanna has been a stellar example of *how* to achieve such success. In 1986, in the wake of Pierce–Hanna's first success in this litigation, the court wrote:

> "It is ironic that the police department commanders criticized Pierce[-Hanna] for lacking 'presence' and strength of character. In her unfailing commitment to the rule of law, she has withstood the indignity of discrimination and retaliation from many, if not all, directions within the police department; she has often had to stand alone, often strenuously opposed by her fellow female as well as male officers. From this fact, as well as the other evidence presented at trial, this court is convinced that, whatever shortcomings there may be in Pierce[-Hanna]'s character, lack of 'presence' and strength of character is not one of them." [74]

Later, upon her second success with regard to the deputy-chief position, this observation was borne out again. The court concluded:

> "Pierce–Hanna could have had the deputy-chief position three years ago. If she had

asked the court to choose from among the four complaining officers who prevailed in the first round, the court would have chosen her because she was unquestionably the most qualified. Yet with a display of remarkable strength and forbearance, she chose to use this litigation not for herself but rather for the benefit of all majors and thus the department itself. ... She therefore agreed to the creation of a new, open, and fair process in which all majors ... could compete." [75]

As a person subject to policies with which she strongly disagreed, Pierce–Hanna dramatically demonstrated how those who would seek to complain and bring about change should pursue their end. And, as a person, who for the last four years has been responsible for enforcement of the very changes she sought to bring about, she has dramatically demonstrated how these changes should be effected. She herself admitted that she is now the sole deputy chief, not because she is a woman and not because she has pursued this litigation, but because of her own unmatched competency and self-confidence and because of the willingness of the Chief of the Montgomery Police Department to recognize and reward that competency.

And this last point brings the court to the second reason why credit for the recent success and quietude, that of the last four years, rests not with the court. The second reason is Police Chief John Wilson. In civil jury trials, this court routinely instructs the jury at the end of the trial that "they must follow the law whether they agree with that law or not." The court cannot say whether Chief Wilson has now come to agree with the course of this litigation. The court can, however, say, based on the record before it, that, for the last four years, Chief Wilson has respected, and unwaveringly so, the *rule of law* with regard to the rights of women, whether he agreed with that law or not. In this regard, he has been an example for all—judges, mayors, lawyers, police officers, and the public in general.

In conclusion, credit for the success and quietude of the last four years—and, in turn, the success of this litigation—rests not with

---

74. *Jordan v. Wilson,* 649 F.Supp. at 1064 n. 2.

75. *United States v. City of Montgomery,* 788 F.Supp. at 1581–82.

the court but with those in the Montgomery Police Department: the person who is first in charge, Chief Wilson, the person who is second in charge, Deputy Chief Pierce–Hanna, and all the others who supervise and are supervised. This court takes little-to-no credit for the last four years in the Montgomery Police Department. Indeed, it is for this very reason—that for the last four years there has been no need for the court to assume a supervisory role in the affairs of the department—that the time may now have come for the court to fade out of the picture.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The motion to dismiss filed by the defendants on August 2, 1996, is conditionally granted.

(2) All remaining and outstanding orders in this litigation shall remain in effect only until February 28, 1997, so that the parties to this litigation can complete their review of compliance with these orders.

(3) Within 30 days prior to February 28, 1997, any party may make appropriate motions regarding whether circumstances warrant the court's retention of jurisdiction for any longer period of time as to these orders.

## ORDER

By memorandum opinion and judgment entered on December 20, 1996, the court conditionally granted the motion to dismiss filed by defendants on August 20, 1996. *Jordan v. Wilson*, 951 F.Supp. 1571 (M.D.Ala. 1996). The court stated that "All remaining and outstanding orders in this litigation shall remain in effect only until February 28, 1997, so that the parties to this litigation can complete their review of compliance with these orders." *Id.* at 1583. The court further stated that, "Within 30 days prior to February 28, 1997, any party may make appropriate motions regarding whether circumstances warrant the court's retention of jurisdiction for any longer period of time as to these orders." *Id.* In other words, the court gave all parties until February 28, 1997, to object to the dismissal of this litigation. The court has received no objections.

It is therefore the ORDER, JUDGMENT, and DECREE of the court:

(1) That all prior remaining and outstanding orders in this litigation are vacated and dissolved; and

(2) That this lawsuit is dismissed in its entirety.

It is further ORDERED that costs are taxed against defendants, for which execution may issue.